**UNITED STATES, Appellant and Cross-Appellee,**

v.

**Captain Michael A. JOHANNS, U.S. Air Force, Appellee and Cross-Appellant.**

No. 48,445.
ACM 23699.

U.S. Court of Military Appeals.

June 10, 1985.
Certiorari Denied Oct. 7, 1985.
See 106 S.Ct. 147.

For Appellant and Cross-Appellee: *Major Robert E. Ferencik, Jr.* (argued); *Colonel Kenneth R. Rengert* and *Captain Brenda J. Hollis* (on brief).

For Appellee and Cross-Appellant: *Mary Louise Frampton, Esquire* (argued); *Colonel Leo L. Sergi* and *Captain Kathleen G. O'Reilly* (on brief).

Amicus Curiae on Behalf of Appellee: *Eugene R. Fidell, Esquire* (argued);

**156**

*Charles S. Sims, Esquire,* and *Arthur B. Spitzer, Esquire,* of counsel—For American Civil Liberties Union Foundation.

### Opinion of the Court

EVERETT, Chief Judge:

### I

Contrary to his pleas, Captain Michael A. Johanns was found guilty by general court-martial of four specifications of conduct unbecoming an officer, in violation of Article 133 of the Uniform Code of Military Justice, 10 U.S.C. § 933, and one specification of conduct prejudicial to good order and discipline or of a nature to bring discredit on the armed forces, in violation of Article 134, UCMJ, 10 U.S.C. § 934. The court members sentenced him to dismissal from the armed forces on July 2, 1982. The convening authority approved these findings of guilty and the sentence. The United States Air Force Court of Military Review on October 26, 1983, set aside three of the findings of guilty under Article 133 and ordered a rehearing on sentence on the remaining findings of guilty. 17 M.J. 862. A government motion for reconsideration of this decision was denied by that Court on December 7, 1983.

On December 16, 1983, the Judge Advocate General of the Air Force, pursuant to Article 67(b)(2), UCMJ, 10 U.S.C. § 867(b)(2), certified the following questions for review by this Court:

### I

UNDER THE CIRCUMSTANCES OF THIS CASE, WAS THE COURT OF [MILITARY] REVIEW CORRECT IN NOT SUSTAINING CONVICTION OF CONDUCT UNBECOMING AN OFFICER IN VIOLATION OF ARTICLE 133 AS TO SPECIFICATIONS 2, 3, AND 4 OF CHARGE I?

### II

IF THE FOREGOING IS ANSWERED IN THE AFFIRMATIVE, WAS THE COURT OF MILITARY REVIEW CORRECT IN NOT SUSTAINING A CONVICTION OF CONDUCT TO THE PREJUDICE OF GOOD ORDER IN VIOLATION OF ARTICLE 134 AS TO SPECIFICATIONS 2, 3 AND 4 OF CHARGE I?

Thereafter, on July 6, 1984, this Court granted the accused's cross-petition for review of the following question raised by appellate defense counsel:

### III

WHETHER SPECIFICATION OF CHARGE I AND CHARGE II SHOULD HAVE BEEN DISMISSED AS THAT SPECIFICATION WAS MULTIPLICIOUS FOR FINDINGS PURPOSES WITH SPECIFICATION 1 OF CHARGE I.

The above questions were raised with respect to the findings of guilty entered at the accused's trial on the following charges and specifications:

CHARGE I: Violation of the Uniform Code of Military Justice, Article 133. Specification 1: In that CAPTAIN MICHAEL A. JOHANNS, United States Air Force, 91st Strategic Missile Wing, did, at Minot Air Force Base, North Dakota, on or about 5 October 1981, wrongfully, dishonorably, and disgracefully have sexual intercourse with Donna R., Sergeant, United States Air Force, the said Sergeant Donna R. being, at that time, the lawful wife of an active duty enlisted member of the United States Air Force, contrary to the customs and traditions of the armed forces of the United States. Specification 2: In that CAPTAIN MICHAEL A. JOHANNS, United States Air Force, 91st Strategic Missile Wing, did, at Minot Air Force Base, North Dakota, on or about 8 October 1981, wrongfully, dishonorably, and disgracefully fraternize and associate on terms of military equality with enlisted members of the United States Air Force, to wit: Sergeant Donna R., by going into the military quarters of the said Sergeant Donna R. at Minot Air Force Base, North Dakota and sharing the same bed with the said Sergeant Donna R. while the said Sergeant Donna R. was intoxicated and

at a time when the said Sergeant Donna R. was the lawful wife of an enlisted member of the United States Air Force, contrary to the customs and traditions of the armed forces of the United States. Specification 3: In that CAPTAIN MICHAEL A. JOHANNS, United States Air Force, 91st Strategic Missile Wing, did, at Minot, North Dakota, on three or four separate occasions during September, 1981, wrongfully, dishonorably, and disgracefully fraternize and associate on terms of military equality with Staff Sergeant, then Sergeant, Sheryl K., a female active duty enlisted member of the United States Air Force, by engaging in acts of sexual intercourse with the said Staff Sergeant, then Sergeant, Sheryl K., contrary to the customs and traditions of the armed forces of the United States.

Specification 4: In that CAPTAIN MICHAEL A. JOHANNS, United States Air Force, 91st Strategic Missile Wing, did, at Minot Air Force Base, North Dakota, on two or three occasions, during November, 1981, wrongfully, dishonorably, and disgracefully fraternize and associate on terms of military equality with Senior Airman Michelle P., then known as Senior Airman Michelle S., a female active duty enlisted member of the United States Air Force, by engaging in acts of sexual intercourse with the said Senior Airman Michelle P., then known as Senior Airman Michelle S., contrary to the customs and traditions of the armed forces of the United States.

CHARGE II: Violation of the Uniform Code of Military Justice, Article 134. Specification: In that CAPTAIN MICHAEL A. JOHANNS, United States Air Force, 91st Strategic Missile Wing, did, at Minot Air Force Base, North Dakota, on or about 5 October 1981, wrongfully have sexual intercourse with Donna R., a married woman, not his wife.

The Court of Military Review in its decision below delineated the facts surrounding these offenses as follows:

The accused was a single, 28 year old missile combat crew commander who had been stationed at Minot Air Force Base, North Dakota, since completion of training in 1978. The Officers' Open Mess at Minot was being redecorated; as a result, officers had been authorized to utilize the facilities of the Noncommissioned Officers' Open Mess. The accused availed himself of the opportunity and socialized at the NCO Club. There he met Sgt R. (who was married), SrA P. and SSgt K. He dated each and ultimately had sexual relations with them all. On one occasion, the accused and Sgt R. went on a date downtown, and thereafter returned to her house on base. Sgt. R. was intoxicated and therefore remembers nothing other than the next morning the accused was asleep next to her in her bed.

All this interaction was completely consensual, private, nondeviate, and sometimes instigated by the women involved. The accused was neither the commander nor supervisor of any of these enlisted members, and their respective relationships were not publicized.[4] In the opinion of the enlisted women, the accused's activities were neither dishonorable nor service discrediting. The charges resulted from the apparently private, voluntary liaisons.

[4] It was stipulated at trial that the allegations were brought to the attention of the accused's commander by a member of his squadron on the basis of inferences he drew from conversations with the accused.

17 M.J. at 864.

The Government had contended before the Court of Military Review that there was a custom in the Air Force which prohibited fraternization and made criminal "the association of officers with enlisted personnel on terms of military equality." However, the court below found "that at the time of the offenses in issue, there did not exist a clear-cut standard for gauging so called 'fraternization' in the Air Force." *Id.* at 865. Furthermore, the court

specifically [found] that as a matter of fact and law the custom in the Air Force

against fraternization has been so eroded as to make *criminal prosecution* against an officer for engaging in mutually voluntary, private, non-deviate sexual intercourse with an enlisted member, neither under his command nor supervision, unavailable.

*Id.* at 869 (footnote omitted).

## II

In *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), the Supreme Court emphasized that "the military is, by necessity, a specialized society separate from civilian society." *Id.* at 743, 94 S.Ct. at 2555. Moreover, "to maintain the discipline essential to perform its mission effectively, the military has developed what 'may not unfitly be called the customary military law' or 'general usage of the military service.'" *Id.* at 744, 94 S.Ct. at 2556. The Supreme Court pointed out that Articles 133 and 134 of the Uniform Code have a lineage extending back more than three centuries, *id.* at 745–46, 94 S.Ct. at 2556–57; and that "[d]ecisions of this Court during the last century have recognized that the longstanding customs and usages of the services impart accepted meaning to the seemingly imprecise standards of Arts. 133 and 134." *Id.* at 746–47, 94 S.Ct. at 2557. Thus, in 1857, the Court had "upheld the Navy's general article, which provided that '[a]ll crimes committed by persons belonging to the navy, which are not specified in the foregoing articles, shall be punished according to the laws and customs in such cases at sea.'" *Id.* at 747, 94 S.Ct. at 2557, citing *Dynes v. Hoover*, 20 How. 65, 15 L.Ed. 838 (1857). The rationale for this result had been that,

"[n]otwithstanding the apparent indeterminateness of such a provision, it is not liable to abuse; for what those crimes are, and how they are to be punished, is well known by practical men in the navy and army, and by those who have studied

the law of courts-martial, and the offenses of which the different courts martial have cognizance." *Id.*, at 82.

In considering Captain Levy's contention that Articles 133 and 134 were "void for vagueness" under the due process clause of fifth amendment, the Supreme Court concluded that, "[f]or the reasons that differentiate military society from civilian society, we think Congress is permitted to legislate both with greater breadth and with greater flexibility when prescribing the rules by which the former shall be governed than it is when prescribing rules for the latter." 417 U.S. at 756, 94 S.Ct. at 2561. "Because of the factors differentiating military society from civilian society," the Court held

that the proper standard of review for a vagueness challenge to the articles of the Code is the standard which applies to criminal statutes regulating economic affairs.

*Id.* Consequently, Levy's attack on Articles 133 and 134 as void for vagueness was rejected because he "could have had no reasonable doubt that his public statements urging Negro enlisted men not to go to Vietnam if ordered to do so were both 'unbecoming an officer and a gentlemen', and 'to the prejudice of good order and discipline in the armed forces.'" *Id.* at 757, 94 S.Ct. at 2562.

██ Obviously, the premise for this result in *Parker v. Levy, supra,* was that, in view of the military customs, usage, and training the accused could not successfully claim that he lacked constitutionally required notice under the more relaxed standard of measuring void-for-vagueness. However, because that premise is inapplicable to Captain Johanns, the result here must be that reached by the Court of Military Review. *Cf. Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957); *United*

---

1. The Court also pointed to *Smith v. Whitney*, 116 U.S. 167, 6 S.Ct. 570, 29 L.Ed. 601 (1886); *United States v. Fletcher*, 148 U.S. 84, 13 S.Ct. 552, 37 L.Ed. 378 (1893); and *Swaim v. United States*, 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823

(1897), in support of its thesis that "the usages and customs of war" and "training and experience in the service" give precision to the general prohibitions contained in Aricles 133 and 134, 417 U.S. 733, 747, 748 (1974).

*States v. Tolkach*, 14 M.J. 239 (C.M.A. 1982).

In discussing Article 133, the Manual for Courts-Martial in effect when Johanns was tried explained:

Conduct violative of this article is action or behavior in an official capacity which, in *dishonoring* or *disgracing* the individual as an officer, *seriously* compromises his character as a gentleman, or action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the individual personally, *seriously* compromises his standing as an officer.

Para. 212, Manual for Courts-Martial, United States, 1969 (Revised edition) (emphasis added). With respect to disorders and neglects to the prejudice of good order and discipline in the armed forces, the Manual remarked:

Almost any irregular or improper act on the part of a member of the military service could be regarded as prejudicial in some indirect or remote sense; however, the article does not contemplate these distant effects. It is confined to cases in which the prejudice is reasonably direct and palpable.

\* \* \* \* \* \*

A breach of a custom of the service may result in a violation of this clause of Article 134. In its legal sense the word "custom" imports something more than a method of procedure or a mode of conduct or behavior which is merely of frequent or usual occurrence. *Custom arises out of long established practices which by common consent have attained the force of law in the military or other community affected by them.* There can be no such thing as a custom that is contrary to existing law or regulation. *A custom which has not been adopted by existing statute or regulation ceases to exist when its observance has been long abandoned.* Many customs of the service are now set forth in regulations of the various armed forces. Violations of those customs should be charged under Article 92 as violations of the regulations in which they appear.

Para. 213*b*, Manual, *supra* (emphasis added). The language of the 1951 Manual for Courts-Martial is almost identical. *See* Para. 213*b*, Manual, *supra* (emphasis paras. 213 and 213*b*, Manual for Courts-Martial, United States, 1951; *see also* paras. 182 and 183, Manual for Courts-Martial, United States Army, 1949 (discussing Articles of War 95 and 96). Interestingly, none of these three Manuals contains a form specification for "fraternization." *See* App. 6, 1969 Manual; App. 6*c*, 1951 Manual; App. 4, 1949 Manual, all *supra*.

Consistent with these Manual provisions, this court has "indicated that Article 134, 10 U.S.C. § 934, is not intended 'to regulate the wholly private moral conduct of an individual.' *See United States v. Berry*, 6 U.S.C.M.A. 609, 614, 20 C.M.R. 325, 330 (1956); *United States v. Snyder*, 1 U.S.C. M.A. 423, 427, 4 C.M.R. 15, 19 (1952). These pronouncements have been interpreted to mean that "[f]ornication in the absence of aggravating circumstances is recognized as not an offense under military law." *United States v. Wilson*, 32 C.M.R. 517, 518 (A.B.R. 1962). Certainly officers hold a special status, whereunder a higher standard of conduct is required of them by law and custom. *United States v. Means*, 10 M.J. 162 (C.M.A. 1981). Nonetheless, even for an officer, private fornication in the absence of some other aggravating circumstance would not seem subject to prosecution under Articles 133 and 134—regardless of the moral censure to which this activity might be subject.

If the officer's sexual partner is an enlisted person, does this constitute sufficient aggravation to make private fornication subject to prosecution? For two reasons, the answer to this question depends on whether there was a custom proscribing this type of relationship. In the first place, if such a custom exists, violation of that custom would tend to have a much more direct and palpable effect on good order and discipline and would more seriously compromise the officer's standing. He would be perceived as flouting military authority—which, of course, no officer may do.

Second—and constitutionally more important—the existence of such a custom would provide notice to officers, so that they would have no reasonable doubt as to the legal requirements to which they are subject. Obviously, "not every social contact between an officer and enlisted man is or even can reasonably be prohibited. To do so would be inconsistent with our democratic concept of social relations and, probably, unavailing." *United States v. Pitasi,* 20 U.S.C.M.A. 601, 608, 44 C.M.R. 31, 38 (1971). Custom can help define which relationships between officers and enlisted persons are improper.

Customs differ among the armed services. Coast Guard customs and regulations still allow the wearing of a beard, as did the Navy until recently; but the other services require their members to be clean-shaven. In the Army, an officer still may not protect himself from rain with an umbrella; but in the Air Force this custom has been abandoned. Indeed, the Air Force— the most recently created of the armed services—has never honored some of the customs recognized in the senior services; and perhaps because both officers and airmen at one time served together in small flight crews, the barriers placed by custom between officers and enlisted persons have probably always been lower in that service than in the others.

Undoubtedly, the entry into the armed services of large numbers of "citizen soldiers" during World War II, the Korean War, and the Vietnam War led to abandonment of the observance of many military customs. *Cf.* para. 213*a* of the 1969 and 1951 Manuals, both *supra.* Moreover, since few women other than nurses served in uniform before World War II, there was little opportunity for custom to develop concerning officer-enlisted relationships where different sexes were involved. Indeed, as officer-enlisted marriages have been increasingly condoned by service directives, it has become increasingly diffi-

cult for servicepersons to infer that officer-enlisted dating and social contact—an inevitable prelude to wedlock—are forbidden by custom.

The uncertainty as to the proper perimaters of social contacts between officers and enlisted persons—especially when they are of different sexes—led this Court to comment fourteen years ago concerning fraternization: "While the drafting of an appropriate regulation might be difficult, we recommend it to the responsible military authorities." *United States v. Pitasi, supra* at 608, 44 C.M.R. at 38. Apparently, this suggestion was not heeded by the Air Force, for we have been cited to no directive of that service which specifically deals with fraternization or with the type of relationship in which Captain Johanns was involved. Moreover, as already noted, previous Manuals for Courts-Martial did not treat this topic—although a form specification for fraternization is now included in the 1984 Manual. *See* para. 83*f*, Part IV, Manual for Courts-Martial, United States, 1984.

The court below apparently determined that no custom of that service prohibited Captain Johanns' private sexual relationships with several enlisted women.[2] In the face of this determination by a tribunal which has factfinding powers, it must be assumed that Johanns did not receive notice from an Air Force custom or long-established practice that his amorous activities might transgress Articles 133 and 134. Significantly, Captain Johanns made an effort to determine whether Air Force policy forbade sexual involvements with enlisted women. In response to his inquiry, his supervisor gave him a copy of an article in an Air Force publication which had been written by a highly regarded judge advocate. *See* Flatten, *Fraternization,* 10 Air Force Reporter 109 (1981). According to the Court of Military Review, "Our reading of this article reveals that the author believes there is no longer a violation of custom for

---

**2.** Indeed, if the court below had found that such a custom existed there would be serious concern

as to the basis for such a finding.

an officer to 'fraternize' with an enlisted member, so long as they have no command or supervisory relationship." 17 M.J. at 869 n. 20.

Although the barriers separating officers and enlisted persons in the Air Force may be lower than in the other services, the problem of fraternization is not limited to the Air Force. In *United States v. Stocken*, 17 M.J. 826 (A.C.M.R. 1984), the United States Army Court of Military Review held defective two specifications under Article 134 alleging "fraternization" between a male staff sergeant and two female privates. In an opinion by Judge Yawn, the court observed:

The conduct proscribed by the general article has always been confined to cases where the prejudice is direct and palpable. *Such conduct must be easily recognizable as criminal* ; must have a direct and immediate adverse impact on discipline; and must be judged in the context in which the years have placed it ... The allegations against appellant fail to meet this test.

*Id.* at 829 (emphasis added). Subsequently, on November 29, 1984, the Army issued new guidelines with examples in order to clarify the limitations on social contacts between officers and enlisted persons. *See* HQDA LTR 600–84–2 (Letter from MG Robert M. Joyce, U.S.A, The Adjutant General, November 23, 1984).

 Obviously, clear directives as to permissible contacts between officers and enlisted persons will obviate the issues present in this case. Under the first amendment and also in light of the Supreme Court's interpretation of Article I, Section 8, Clause 14 of the Constitution in *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), some social contacts may be constitutionally protected. For example, officers could not be prohibited from attending bona fide religious services with enlisted persons. *Cf. United States v. Nation*, 9 U.S.C.M.A. 724, 26 C.M.R. 504 (1958); *United States v. Wysong*, 9 U.S.C.M.A. 249, 26 C.M.R. 29 (1958);

*United States v. Milldebrandt*, 8 U.S.C.M.A. 635, 25 C.M.R. 139 (1958). On the other hand, restrictions on contacts—male/female or otherwise—where there is a direct supervisory relationship, can be imposed. However, we need not speculate further about the legality of hypothetical directives that may be issued at some future time.

### III

█ With respect to the case at bar, it appears that Captain Johanns lacked the notice from custom or otherwise which, even under the relaxed standard of review established by *Parker v. Levy, supra*, is constitutionally necessary to meet the due-process requirements of the fifth amendment. Therefore, the Court of Military Review properly dismissed specifications 2, 3, and 4 of Charge I; and the two certified questions must be answered in the affirmative. Because of multiplicity, Charge II and its specification must also be. dismissed. *United States v. Rodriquez*, 18 M.J. 363 (C.M.A. 1984).

Accordingly, the decision of the United States Air Force Court of Military Review as to Charge II and its specification is reversed; the findings of guilty thereon are set aside and that Charge and its specification are dismissed. In all other respects, the decision below is affirmed.

Judge FLETCHER concurs.

COX, Judge (concurring in part, concurring in the result in part):

The Judge Advocate General of the Air Force certified the following question:

UNDER THE CIRCUMSTANCES OF THIS CASE, WAS THE COURT OF [MILITARY] REVIEW CORRECT IN NOT SUSTAINING CONVICTION OF CONDUCT UNBECOMING AN OFFICER IN VIOLATION OF ARTICLE 133 AS TO SPECIFICATIONS 2, 3, AND 4 OF CHARGE I?

Believing that the evidence establishes beyond any reasonable doubt that the conduct of the accused was conduct unbecoming an officer, I would have no difficulty in answering this question in the negative.[1]

The key issue presented in this case is whether the conduct of the accused violated Article 133, Uniform Code of Military Justice, 10 U.S.C. § 933. There are many kinds of relationships between officer and enlisted personnel, regardless of sex. Most of these relationships do; not ripen into conduct which could be deemed unlawful. However, when the relationship between an officer and several enlisted members of the opposite sex does ripen into obvious and open sexual relationships, including, as in this case, one adulterous relationship which even the Court of Military Review found criminal, then, in my opinion, such conduct becomes "unbecoming an officer and a gentleman," in violation of Article 133.

I reach. this conclusion without traversing the convoluted paths of "fraternization" and "customs of the Air Force." There are certain standards of conduct expected of those who belong to the officer corps which are understood by them and which exceed the standards that apply to civilians. *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *see Dynes v. Hoover*, 20 How. 65, 15 L.Ed. 838 (1857). Conduct that does not meet these standards, under certain circumstances, amounts to a violation of Article 133. While I would not attempt to define the exact parameters of the conduct proscribed by Article 133, I have no doubt that the accused's conduct here does fall within those parameters. I also have no doubt that most officers would agree with me, as did the court-martial members, the military judge, the staff judge advocate, the convening authority, and three judges of the Court of Military Review.

Had this case been pleaded, tried, and affirmed below simply along these lines, I would have sustained the findings of the trial court. However, the pleadings and the military judge's instructions added the additional element of "fraternization," a concept difficult of definition and certainly difficult to establish as violative of a "custom of the service," since it occurs in both permissible and impermissible forms. Preoccupation with this concept is what led the Court of Military Review astray, in my view.

The majority of the Court of Military Review seems to have regarded the question as simply whether "there is in the United States Air Force a custom which proscribes unlawful fraternization and makes actionable the association of officers with enlisted personnel on terms of military equality." *United States v. Johanns*, 17 M.J. 862, 865 (A.F.C.M.R. 1983). While the majority never undertook to define "fraternization," they noted the absence in the case law of "any discussion of voluntary, private, non-deviate sexual activity between of-age officer and enlisted members, who are of age, who were not associated with one another in any way on duty." *Id.* at 867. Presumably, it was such conduct, without more, that the majority of the Court of Military Review found not to be prohibited by custom in the Air Force.

As I read the record of trial, the accused was convicted of quite a different offense. To be sure, the trial judge instructed the court members that, as to each of the specifications, they must find that certain conduct occurred and that it constituted "fraternization." However, he defined "fraternization" as

> to associate. with another or others on equal terms. Not all associations between Air Force officers and enlisted personnel are wrongful. It is the appropriateness, of the time, place, circumstances, and conduct which is the determinant. To be wrongful, the fraterniza-

---

**1.** Inasmuch as I believe there is ample evidence to conclude that the accused was guilty of conduct unbecoming an officer and a gentleman, I would have no hesitancy in answering the second certified question in the negative as well, but for the factual findings of the Court of Military Review, since conduct unbecoming an officer and a gentleman is clearly prejudicial to good order and discipline.

tion must be of such a nature as *to demean the officer, to detract from the respect and regard for authority inherent in the military relationship between officers and enlisted*. Essentially, to establish fraternization, the prosecution must prove that the association with enlisted personnel was *under such circumstances which were prejudicial to good order and discipline in the armed forces*.

(Emphasis added.)

Further, he defined "conduct unbecoming an officer and a gentleman" for the court as

actions or behavior in an official capacity, which in dishonoring or disgracing the individual as a commissioned officer, seriously compromises his character as a gentleman, or action or behavior in an unofficial or private capacity, which *in dishonoring or disgracing the individual personally, seriously compromises his standing as a commissioned officer*. To constitute unbecoming conduct, the misbehavior should not be slight, but must be *of a material and pronounced character*. Unbecoming as used here, refers to *behavior which is not merely inappropriate or unsuitable, such. as not in good taste, against propriety, or not consonant with usage, but rather which is morally unbefitting and unworthy*.

(Emphasis added.)

In other words, the accused was not convicted of just dating or casual sex with enlisted servicewomen; he was convicted of carrying on these activities in such a manner as to cause these specific deleterious effects on his own status as an officer and on military good order and discipline in general. Furthermore, it should be pointed out that, at trial, the defense specifically agreed that the type of "fraternization" described by the military judge *violated a custom of the Air Force*. Their argument was simply that the accused's activities did not meet the threshold of this type of "fraternization." The court members obviously believed otherwise.

What was the evidence that showed this impact on military authority? Even though the only witnesses in the trial were the accused's paramours (all of whom expressed the utmost respect and admiration for him and denied that anyone else in the world had any inkling of their relationship with him), it is not difficult to detect the open and notorious nature of his associations.[2]

2. The following excerpts from the record of trial are illustrative:

[*Testimony of Staff Sergeant Sheryl K.*]
[TC] How did you happen to meet the accused?
[WIT] I was introduced to him by a co-worker of mine.

* * * * * *

I was down in the missile wing DO office. A friend of mine introduced Captain Johanns out of courtesy.
Q Was that friend another enlisted person?
A Yes sir.
Q And who was that?
A Sergeant Finnegan.
Q After that first meeting, did you have any other contact with the accused?
A Yes sir.

* * * * * *

Q What was the nature of that contact?
A We went out on a few dates.

* * * * * *

Q Sergeant [K.], at any time did you have sexual intercourse with the accused?
A Yes sir.
Q Do you recall how many times?

A Three or four. I don't keep count.

* * * * * *

Q At what point in time did you break off your relationship?
A It was in September.
Q And why was that?
A (Pause.)
Q Did you have any reasons?
A No sir.
Q Was the accused dating anyone else?
A He was dating several others.

* * * * * *

[*Testimony of Sergeant Donna R.*]
[TC] Sergeant [R.], do you know when you first met the accused?
[WIT] It was at a promotion party, I believe. I'm not sure of the exact date, sir.
Q Where was that?
A The NCO Club, here on base. [*See* Note A, *infra*.]
Q Were you introduced to him by someone?
A Yes sir, I was.
Q Who was that?
A Sergeant [K.].
Q That is Staff Sergeant [K.]?

A Yes. She was a buck sergeant at the time.

\* \* \* \* \* \*

Q Let me draw your attention to the 5th of October of last year. Did you have any contact with the accused on that date?

A Yes sir, I did.

Q Would you please tell the court what that was?

A It was at the NCO Club here on base. I was over there with a friend, Staff Sergeant Pierce, Leslie Pierce, and we were over there having a few drinks and Captain Johanns and a couple of his friends walked in. He didn't come over right away. He came over after he had a drink or so. He came over and visited with us for a few minutes, and we were talking, and he asked me over to his trailer.

Q On the 5th of October, when you met him as you say, were you married?

A Yes sir, I was.

\* \* \* \* \* \*

Q Now, after the accused invited you over to his trailer, did you go?

A Yes sir, I did.

Q Where is that trailer located?

A In the trailer court on base, sir.

Q Were you wearing a wedding band?

A Yes sir, I was.

Q Sergeant [R.], when you went to his trailer, did you engage in sexual intercourse with the accused?

A Yes sir, I did.

Q Now, after the 5th of October, did you ever [sic] any other contact with him?

A Yes sir, I did.

Q When was that?

A It was on the 8th of October.

Q And what happened on that day?

A I was going down to Friday's bar in downtown Minot with two other friends, and I invited Captain Johanns to go along. We all went in my car; I drove down. The four of us all went together.

Q The two other friends, were they enlisted?

A Yes sir, they were.

Q All right, go ahead. What happened then?

A We went to Friday's and it was mainly a social event; everybody was on a first name basis that night, and I'm not sure of the exact amount of drinks we had. Everybody was having a pretty good time.

Q Were you there very long?

A Until closing, sir. About one or one-thirty I would say.

Q Did you have many drinks?

A I would say a few. I don't know the exact amount.

Q Do you think you were intoxicated when you left?

A I know I was. I'm not sure about anybody else.

Q What happened after the bar closed?

A We all proceeded to come back to base. I didn't drive. Airman First Class Desserine drove back.

Q Where was the accused; was he in the car with you?

A Yes sir, he was.

Q What happened?

A After we got back to base, Airman First Class Desserine dropped himself off at his dorm, I believe, and the Sergeant Kraft drove to his dorm and dropped himself off, and from what I can recall, Captain Johanns drove me to my house.

Q Do you recall then what happened?

A We went inside. I put my dogs out. I went upstairs to change clothes and that is all I can remember.

Q Do you recall asking the accused to spend the night with you?

A No sir, I don't remember.

Q What happened, Sergeant [R.], when you woke up the next morning?

A Captain Johanns was in the bed beside me.

Q Do you recall whether or not you engaged in sexual intercourse with him?

A No sir, I don't.

\* \* \* \* \* \*

Q Did the accused know, on both dates, that you were married?

A Yes sir, he did.

\* \* \* \* \* \*

Q Did he ever express any concern about your husband finding out?

A Yes sir, he did.

\* \* \* \* \* \*

Q You said you knew Sergeant [K.]. Did she ever speak to you concerning the accused?

A Yes sir, she did.

Q What did she tell you?

A Basically, just the problems that she was having seeing him, liking him, things like that.

Q Did she tell you she was going out with him?

A Yes sir, she did.

\* \* \* \* \* \*

Q Sergeant [R.], do you know a Lieutenant [T.]?

A Yes sir, I do.

Q Did you ever go over to his home?

A Yes sir.

Q Who else was there?

A Sergeant [K.], my hushand, Captain Johanns, Lieutenant [T.'s] wife at the time. [*See* Note B, *infra.*]

Q And Lieutenant [T.]?

A Yes sir.

\* \* \* \* \* \*

[*Testimony of Senior Airman Michelle P.*]

[TC] How do you happen to know the accused?

[WIT] I met him through a mutual friend, sir.

Q Who was that?

A Sergeant Finnegan.

\* \* \* \* \* \*

Q After you first met him, did you have occasion to see the accused again?

I am prepared to defer to the expertise and factfinding authority[3] of the Court of Military Review in their conclusion that dating, and even sexual intercourse, between an officer and an enlisted person, *without more*, is not prohibited by custom in the Air Force; and so the accused would have lacked notice that that type of conduct was a crime. *See Parker v. Levy, supra*, 472 U.S. at 752–61, 94 S.Ct. at 2559–64. However, I am frankly astounded by the majority's implicit conclusion that there is no custom in the Air Force (the existence of which had been conceded by the defense at trial) forbidding associations between officers and enlisted personnel that (quoting the military judge) "demean the officer," "detract from the respect and regard for authority inherent in the military relationship between officers and enlisted," "prejudic[e] ... good order and discipline in the armed forces," "dishonor[] or disgrac[e]"

the officer "personally," "seriously compromise[] his standing as a commissioned officer," and are "morally unbefitting and unworthy." Unfortunately, I find no authority for this Court to overturn this remarkable factual conclusion. Article 67(d), UCMJ, 10 U.S.C. § 867(d). Thus, while I must abide by the judgment of the majority below, I wish to make it clear that my deference to their factfinding expertise in the customs of that service in no way forecloses a different result from other service courts, should the circumstances of a particular case so dictate.

With this reservation, I join in the result reached by the Chief Judge. I agree that the specification of Charge II is multiplicious with specification 1 of Charge I. *United States v. Rodriquez*, 18 M.J. 363 (C.M.A. 1984).

A Yes sir.
Q When was that?
A Well, since the time I met him, around September or October, I seen him quite frequently in the club and in a social circumstance at Lieutenant [T.'s] house.
Q Who else was there?
A At the club?
Q At Lieutenant [T.'s]?
A There was Donna and Sheryl; they were in here today; Sergeant Finnegan, Donna's ex-husband, Lieutenant [T.], his wife, Captain Johanns, and myself.
Q Now, did you ever date the accused?
A Yes sir, I did at one time.

\* \* \* \* \* \*

Q Where did you go?
A We went down to the Haunted House at the Fairgrounds at Minot, at that time.

\* \* \* \* \* \*

Q After you went to the funhouse downtown, what did you do with the accused?

A We returned to my residence, sir.
Q Here on base?
A Yes sir.
Q That evening, did you engage in sexual intercourse?
A Yes sir.
Q Were there any other times when you had sexual intercourse with the accused?
A Yes sir.

*Note A*: During all times pertinent here, the Officers' Club was closed for renovations and all officers were authorized to use the NCO Club.

*Note B*: Though the fact was not mentioned to the court members, at the time of the accused's trial, he was married to the woman who had been Lieutenant T's wife during the relevant time frame. It was Lieutenant T's report of the accused's sexual activity with the enlisted women that brought these matters to the attention of the command.

3. Article 66(c); Uniform Code of Military Justice, 10 U.S.C. § 866(c).