UNITED STATES, Appellee,

v.

David P. SCHNEIDER, Major
U.S. Army, Appellant.

No. 67,806.
CMR No. 9003419.

U.S. Court of Military Appeals.

Argued June 2, 1993.

Decided Sept. 30, 1993.

For Appellant: *Eugene R. Fidell* (argued); *Captain Beth G. Pacella* (on brief); *David M. Lewis, Jr.* (of Counsel).

For Appellee: *Captain Samuel J. Smith, Jr.* (argued); *Colonel Dayton M. Cramer* and *Lieutenant Colonel Joseph A. Russelburg* (on brief); *Major Edith M. Rob* and *Captain Donna L. Barlett.*

*Opinion of the Court*

RYAN, Circuit Judge:[1]

A general court-martial sitting at Fort Leavenworth, Kansas, convicted appellant, Major David P. Schneider, contrary to his pleas, of attempted premeditated murder, conduct unbecoming an officer by committing adultery, and conduct unbecoming an officer by committing perjury in a state court, in violation of Articles 80 and 133, Uniform Code of Military Justice, 10 USC §§ 880 and 933, respectively. He now appeals the decision of the Court of Military Review affirming his conviction and sentence. 34 MJ 639 (1992). He argues that there was insufficient evidence to convict him of these specifications and also that there were several procedural errors during and after trial. 37 MJ 191 (1993). For the reasons discussed below, we affirm.

## I

In 1987, appellant moved to California with his wife and two children, pursuant to his assignment to the Lawrence Livermore National Laboratory. At the Laboratory, he worked with a woman named Paula, and by April 1989, their relationship had become sexual.

In 1989 appellant was assigned to attend the U.S. Army Command and General Staff College at Fort Leavenworth, Kansas, and moved with his family into government quarters there. In August 1989, he met with an insurance agent and purchased an additional $150,000 in life insurance coverage on his wife. He was the beneficiary of this policy, which had an effective date of October 1, 1989. That same summer, appellant sold the former family home in California and used the proceeds to purchase a home in Tracy, California; he convinced his wife that her name should not be on the deed. He then spent Labor Day weekend with Paula in California.

The incident out of which the specification of attempted murder arose occurred on October 20, 1989. That night, appellant's wife awoke with intense pain in her head and was pulled to a sitting position in her bed. She saw appellant, visibly shaken, standing next to the bed. The toilet tank lid from the bathroom lay broken on the floor near his feet. She felt a baseball-sized lump on her head, which was "oozing." She brushed small pieces of porcelain from her hair. He then assisted her to the bathroom, and she sat on the toilet. When she began shaking, he helped her to the bathroom floor and covered her with a quilt. Appellant told his wife, repeatedly, "You must have hit your head." Although appellant suggested taking her to a doctor, his wife wanted only to go back to bed. The next morning, he took her to the medical facility and there told medical personnel that Debbie was sleepwalking, picked up the toilet tank lid, tripped, and hit her head. Other evidence at trial, however, indicated that his wife had never walked in her sleep.[2]

Two weeks later, on November 4, appellant and his wife were to attend the Armor Ball. Appellant made arrangements for a "romantic" night at Embassy Suites Hotel.[3] At appellant's insistence, he and his wife left prior to the end of the ball in

---

1. Judge James L. Ryan of the United States Court of Appeals for the Sixth Circuit, sitting by designation pursuant to Article 142(f), Uniform Code of Military Justice, 10 USC § 942(f).

2. Appellant testified in state trial proceedings that after his wife had gone to bed, he stayed up to work. He noticed the toilet was running and fixed it, but did not replace the tank lid. He then went to bed, but was awakened by a motion on the bed or noise. His wife was sitting on the bed, moaning, with her hand to her head. When he got up to help her, he discovered the shards of the toilet tank lid. She told him she didn't know what had happened. He also testified that he did not "believe" he had told the medical personnel that she had been sleepwalking, because he knew she never walked in her sleep.

3. A week prior to this occasion, appellant had taken his wife for yet another "romantic" overnight stay on the top floor of a local downtown hotel. That night he had tried to get her to drink more champagne than she normally consumed, and then, after dinner, tried to get her out on the balcony of their room. She refused, however, because it was too cold and because she was afraid of heights.

order to go to the hotel. Upon arriving, appellant learned that, although he had asked for an eighth-floor room when making reservations, he was given a room on the seventh floor instead.

They nonetheless took the elevator to the eighth floor, where they were observed by two 16–year–old girls. The girls saw appellant and his wife walk side by side down the hallway. One girl then saw appellant make vigorous hand movements in front of his wife as she faced him with her back to a rail overlooking an interior courtyard. The girl observed appellant put his left arm around his wife at the point where the rail met her back, put his right hand on her chest, and flip her over the rail. The wife fell some 70 or 80 feet, and hit a table on the atrium floor. The girl watched appellant look over the railing, say ("he didn't yell") "for someone to call an ambulance," then walk to the elevator, and walk back to the railing. He then walked back to the elevator and proceeded down. When he reached the atrium floor, appellant was cool and collected. His wife's pelvis was fractured in thirteen places; both left and right femurs were broken in several places; a bone penetrated her abdominal cavity, damaging her colon; and an ankle and several ribs were fractured.

On December 4, one month after the ball and two days after his wife returned home from the hospital, appellant told his wife that he did not love her any more and was getting a divorce. On December 5, he admitted to police that he had had an affair with Paula and that he loved her and hoped to marry her when his divorce was final.

Appellant was charged by state authorities with first-degree assault, in violation of § 565.050, Revised Statutes of Missouri, for the incident at the Embassy Suites Hotel. At the state trial, appellant testified that the incident at the Embassy Suites Hotel occurred when he attempted to carry his wife across the threshold. He picked her up and was carrying her at high port when she told him that they were on the wrong floor. He then turned and tripped; his wife slipped from his grasp, causing her to fall over the balcony railing to the atrium floor. He testified that he did not intend to injure his wife.[4] He was acquitted.

Shortly after the state case was concluded, military authorities charged appellant with specifications of attempted premeditated murder, conduct unbecoming an officer by committing adultery, and conduct unbecoming an officer by committing perjury. A court consisting of officer members found appellant guilty and sentenced him to dismissal, confinement for 23 years, and total forfeitures. The convening authority approved the sentence, except that he suspended forfeitures in excess of $400 pay per month until execution of the dismissal, provided that the suspended forfeitures be paid to appellant's now ex-wife.

## II

### A

We first consider appellant's argument that "[t]he Court of Military Review erred in approving the findings because they were not supported by proof beyond a reasonable doubt and, in the case of the adultery charge, did not constitute an offense as a matter of law." Final Brief at 47. As to the first aspect of this contention, appellant invokes the wrong standard of review. Regarding matters of fact, we do not decide whether the Court of Military Review correctly applied *its* standard of review. Art. 66(c), UCMJ, 10 USC § 866(c). We review under *our* standard of review for legal sufficiency of evidence. Art. 67(c), UCMJ, 10 USC § 867(c)(1989); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Harper*, 22 MJ 157, 161 (CMA 1986). As to the second aspect of appellant's contention, adultery alleged as conduct unbecoming an officer (Art. 133) states an offense. *See United States v. Johanns*, 20 MJ 155, 156, 161 (CMA), *cert.*

---

**4.** This testimony led to the specification in his general court-martial charging him with con-

duct unbecoming an officer by committing perjury.

*denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985).

■ Construing this issue as a challenge to the legal sufficiency of evidence as to the findings, we are satisfied that the prosecution presented sufficient evidence as to each specification for a rational factfinder to find appellant's guilt beyond a reasonable doubt. Specifically, with regard to the attempted-murder charge, we look to the victim's testimony that she was awakened in the middle of the night with an enormous pain in her head and a baseball-size lump on her head that was oozing fluid; that the bathroom toilet tank lid lay on the bedroom floor near appellant; and that bits of porcelain were in her hair and on her pillow. Medical testimony corroborated that the victim sustained head injuries, and the damaged toilet tank lid was introduced as a prosecution exhibit. In addition, we note that the factfinder could consider that appellant had only a few weeks earlier taken out a large term-life insurance policy on the victim and that he had recently induced the victim to sell their California house and to permit the purchase of another house in California in his name alone. This evidence and more, and the inferences reasonably derivable therefrom, was sufficient as a matter of law to sustain the conviction for attempted murder.

■ Regarding the specification for conduct unbecoming an officer by committing adultery, both appellant and Paula testified in the prior state-court prosecution that they had been having an affair. Appellant's state-trial testimony was received as an admission, and the parties stipulated to Paula's testimony. Appellant's contention is that the evidence of adultery is insufficient because he never explicitly admitted to having sexual intercourse with Paula, only a "two and a half—three month affair." Paula admitted, however, that the "relationship became a sexual relationship" approximately 5 months before the first attempt on the victim's life. In addition to the state-court testimony, several of the trysts were corroborated by documentary evidence and admissions to third parties.

Suffice it to say, there is enough evidence to sustain the conclusion of the factfinder.

■ Finally, as to the conduct-unbecoming specification for appellant's alleged perjury in connection with the state prosecution, there was abundant evidence adduced at the court-martial to overcome a sufficiency-of-evidence challenge. At the court-martial, the prosecution evidence amounted to a recapitulation of the evidence adduced at the state trial in connection with the incident at Embassy Suites. Witnesses testified to having seen appellant push his wife off the balcony. Other witnesses observed appellant after the fall and noted that his demeanor was markedly inconsistent with a concern for the victim's life. The witnesses' observations of appellant's actions contrasted dramatically with appellant's own account. In effect, the military prosecutors reproved the first-degree assault at the hotel; then they proved the content of appellant's testimony as it varied from the prosecution's evidence. The resulting conclusion of the court-martial was that appellant lied under oath at the state trial, and this conclusion was supported by sufficient evidence.

We hold, in sum, that the evidence was legally sufficient to sustain all of the charges and specifications.

**B**

The next issue we consider is appellant's contention that his prosecution for conduct unbecoming an officer ("by wrongfully ... testifying falsely" under "lawful oath" before a jury sitting in the Platte County, Missouri, District Court) "was an abuse of discretion and a violation of double jeopardy." Final Brief at 15.

■ Appellant complains that in prosecuting him for falsely testifying, the military is merely attempting to do indirectly what it cannot do directly. We disagree. Plainly, the Fifth Amendment would have permitted the military to reprosecute appellant directly for first-degree assault or an equivalent offense under the Uniform Code of Military Justice. The Double Jeopardy

Clause does not bar one sovereign from proceeding on a charge of which an accused has been acquitted by another sovereign. *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); *see Heath v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985). Furthermore, the doctrine of collateral estoppel is inapplicable to prosecutions by a separate sovereign. *United States v. Cuellar*, 27 MJ 50, 54–55 (CMA 1988), *cert. denied*, 493 U.S. 811, 110 S.Ct. 54, 107 L.Ed.2d 23 (1989). Since appellant could have been reprosecuted by the military for first-degree assault or its equivalent, he clearly could be prosecuted for the entirely separate offense of conduct unbecoming an officer, which was committed at a wholly distinct place and time.[5]

■ Appellant's subordinate contention that his prosecution for falsely testifying was barred by Army policy also fails. Para. 4–2, Army Regulation 27–10, "Military Justice," provides the general rule:

A person subject to the UCMJ who has been tried in a civilian court may, but *ordinarily* will not be tried by court-martial or punished under Article 15, UCMJ, for the same act over which the civilian court has exercised jurisdiction.

Paragraph 4–3 of the same regulation provides, however, that

an officer exercising GCM [general court-martial] jurisdiction may authorize disposition of a case under the UCMJ and the MCM [Manual for Courts–Martial, United States, 1984] *despite a previous trial.*

(Emphasis added.) The general court-martial convening authority here personally authorized appellant's trial on the falsely-testifying specification, after the requisite findings were made. Art. 34(a), UCMJ, 10 USC § 834(a)(1983). And, as already pointed out, appellant was not, in any event,

prosecuted for "the same act" for which he was tried by the State of Missouri. Thus, the military was in full compliance with its policy. There was no bar to appellant's prosecution for falsely testifying at his civilian trial, so the issue is without merit.

C

■ We next turn to appellant's claim that he was denied a fair trial and due process of law. He contends that the joinder of the false-testimony specification with the attempted-murder charge prejudiced him, because the false-testimony charge in effect allowed introduction of evidence of another attempted murder, *i.e.*, his pushing the victim off the eighth-story balcony. He contends that this joinder was impermissible because it introduced evidence of an offense of which he was acquitted, and because the evidence of that alleged act "spilled over" to the attempted murder charge. Final Brief at 29. In both respects, we disagree.

■ First, an acquittal of an offense does not bar introduction of the same evidence as uncharged misconduct in a subsequent prosecution. *Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990).

■ Second, in accordance with the military judge's specific ruling, it appears that each of these acts would have been independently admissible as proof of the other, in order "to prove motive, intent, and perhaps modus operandi." *See* Mil.R.Evid. 404(b), Manual, *supra; United States v. Curry*, 31 MJ 359 (CMA 1990). Both the military judge and the Court of Military Review ruled that the probative value of the hotel incident outweighed any danger of unfair prejudice (Mil.R.Evid. 403) as to the toilet-tank incident, 34 MJ at 644, and we are satisfied that both courts were within their discretion in so concluding. Appel-

---

5. Appellant misperceives the charge of conduct unbecoming an officer by falsely testifying under oath as amounting to a mere inappropriate overreaching by the military into internal state matters, namely "ensuring the truthfulness of testimony in state courts." Final Brief at 27.

The military's own interest, however, in not having its officers testify falsely anywhere is a thoroughly legitimate basis of concern for military authorities. Art. 133, UCMJ, 10 USC § 933; *see Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987).

lant cannot be prejudiced by spillover if the evidence would have been received anyway. Moreover, the military judge gave a limited-use instruction as to the evidence of other acts.

Appellant also contends that the judge abused his discretion under Mil.R.Evid. 403 in receiving "uncharged misconduct" evidence. Final Brief at 33. The thrust of this argument pertains more appropriately to the misjoinder contention, which we have already decided adversely to appellant. 38 MJ at 392–393. Conduct unbecoming an officer by falsely testifying was *charged;* thus evidence essential to proving the elements of the offense was not evidence of "uncharged misconduct."

 Appellant next complains that "[t]he sequential prosecutions defeated the sequestration of witnesses." Final Brief at 35. In essence, he contends that, between the civilian trial and the court-martial, witnesses could have talked amongst themselves and worked out their story. Appellant cites no authority for the astounding proposition that witnesses must be sequestered in perpetuity or else they may never again be called to testify on a similar matter. We reject this proposition outright.

Finally, appellant complains that the military judge improperly received the state-court testimony of Paula, who, by the time of his court-martial, had vanished without a trace. Final Brief at 36. We, however, are aware of no infirmity in the former-testimony exception to the hearsay rule, which the military judge applied correctly. Mil. R.Evid. 804(b)(1); *see Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

In sum, we reject all aspects of this issue.

### D

 We next consider appellant's contention that the military judge erred in failing to grant a mistrial after learning that appellant's date of rank preceded that of one of the court members. Final Brief at 9. Article 25(a), UCMJ, 10 USC § 825(a), provides as follows:

> Any commissioned officer on active duty is eligible to serve on all courts-martial for the trial of any person who may lawfully be brought before such courts for trial.

Article 25(d)(1) further provides:

> When it can be avoided, no member of an armed force may be tried by a court-martial any member of which is junior to him in rank or grade.

The essential facts surrounding this issue are not in dispute. The junior member of the court-martial panel was Major Margaret Horrell. Her Officer Record Brief (ORB) erroneously indicated a date of rank earlier than appellant's. The ORB dates were used by the Government to limit the potential court-member pool to members senior to appellant. Due to the erroneous ORB, Major Horrell was included in the member pool and ultimately selected for the court-martial. Prior to the trial, however, each prospective member was required to fill out a questionnaire. Among the information requested was the member's date of rank. Major Horrell responded correctly, indicating a date of rank junior to appellant's. Both the questionnaires and the ORBs were made available to the parties before trial.

Reportedly, defense counsel first noticed the discrepancy while the court members were deliberating on findings, after all evidence on the merits had been presented. The defense did not bring the matter to the military judge's attention at that time, however. Later that day, findings were duly returned—still without comment from the defense—and the court-martial recessed for the evening. It was not until the next morning that defense counsel brought the matter to the military judge's attention. Needless to say, Major Horrell's correct date of rank was promptly ascertained. The military judge was not pleased with the defense's delay in making its implied challenge to the jurisdiction of the court-martial and to the findings. The judge ruled that the defense had waived objec-

tion, implicitly holding that the defect was not jurisdictional. However, the judge granted a challenge of Major Horrell prospectively for sentencing. The Court of Military Review agreed with the judge's ruling. 34 MJ at 643.

Historically, the seniority requirement was established to "remove[ ] any temptation on the part of the members to convict the accused and thus perhaps create an opportunity for personal promotion." F. Gilligan and F. Lederer, *Court–Martial Procedure* § 15–24.00 at 564 (1991); *see also* W. Winthrop, *Military Law and Precedents* 72 (2d ed. 1920 Reprint); 17 Op. Att'y Gen. 397–98 (1882). Although it is apparent that Major Horrell was "junior ... in rank or grade" to appellant within the meaning of Article 25, nevertheless, a glance at Article 25(a) is all that is necessary to know that the defect that occurred here was not jurisdictional. That subsection makes clear that "[a]ny commissioned officer on active duty is eligible to serve on all courts-martial...." *See United States v. McGee*, 15 MJ 1004, 1006 (NMCMR 1983).

We agree with the courts below that the defense was dilatory in not bringing the discrepancy to the judge's attention sooner. We need not resolve whether such inaction amounted to waiver or forfeiture, for we detect no possibility that appellant was prejudiced by Major Horrell's participation on findings. *See* Art. 59(a), UCMJ, 10 USC § 859(a). Assuming the concerns historically underlying Article 25 retain validity, Major Horrell had no reason to know when she participated in jury deliberations that she was junior to appellant until after the defense brought the matter to the judge's attention.[6] Thus, personal advantage could not have been a motivation in deciding to convict. This issue is without merit, and appellant is entitled to no relief.

### E

■ Appellant contends that the convening authority abused his discretion in two respects. Appellant argues that the convening authority exceeded his authority in crafting the conditional suspension of forfeitures for the benefit of appellant's ex-wife and children. Final Brief at 38. Although the court-martial sentenced appellant to, *inter alia*, total forfeitures, the convening authority suspended so much of the forfeiture of appellant's pay and allowances as exceeded $400 pay per month, *on the condition that* appellant "continuously claim on an Internal Revenue Service Form W–4, so long as he may legitimately do so, that he is single with two dependents, and that he initiate and maintain a monthly military pay allotment to be paid directly to ... [the victim] in the amount of $2500.00."

The final decree of divorce between appellant and the victim provided that the monetary award for support and maintenance was considerably less than the suspended forfeitures flowing to the victim as a result of the convening authority's action. By letter dated May 1, 1991, counsel for appellant requested the convening authority to conform the amount of suspended forfeitures flowing to the victim to the amount awarded in the divorce proceedings and to permit appellant to receive a sufficient portion of his pay to satisfy an outstanding debt. (Attachment to Final Brief.) The convening authority declined on May 24, 1991, to modify his action. Appellant now contends that the convening authority had "a duty to conform the conditional partial suspension of the sentence to the levels provided in the state court decree," and he accuses the convening authority of interfering with a matter "reserved" to the state court. Final Brief at 41. We reject these contentions.

■ The sentence handed down by a court-martial is independent of any civil judgment. Appellant's right is to an appropriate sentence, no more and no less. It was entirely permissible, of course, for appellant to request the convening authority

---

**6.** Like the other members of appellant's court-martial, Major Horrell was imported from another installation for appellant's trial.

to reduce his forfeitures. By the same token, the convening authority was within his discretion in denying this reduction.

 Pay and allowances forfeited as a result of a court-martial sentence revert to the United States. *See* para. 70511(a)(5), DOD 7000.14R, Military Pay and Allowances Entitlements Manual (Jan. 1, 1993); *see also* RCM 1003(b)(2), Discussion, Manual, *supra.* Thus, neither appellant nor anyone else, save the United States, has standing to contest the appropriateness of the disposition of forfeitures. We have recently upheld the convening authority's inherent power to make a suspension of forfeitures contingent upon an accused's initiating and maintaining an allotment for the benefit of the servicemember's minor children. *United States v. Cowan,* 34 MJ 258 (CMA 1992). Even if it should somehow be authoritatively determined that the continuing disposition of forfeitures to the victim here is inappropriate, appellant does not stand to benefit. This aspect of appellant's argument is without merit.

 Appellant next contends that the convening authority abused his discretion in declining to defer execution of appellant's sentence to confinement. Final Brief at 43. At the conclusion of the court-martial, appellant requested that the convening authority defer his sentence to confinement during the appellate process. (Document not found in allied papers, but attached to appellant's Final Brief (letter dated 17 Nov 90.)) The convening authority denied the request,

> base[d] ... upon the seriousness of the offenses of which the accused stands convicted, the amount of confinement imposed by the court-martial and the attendant risk of flight, and the adverse effect which such deferment would have on good order and discipline in the command.

Appellant reiterated his request for deferment of confinement several months later, in a post-trial submission pursuant to RCM 1105 ("Post-trial Objections and Submissions ..." at 20, dated Feb. 4, 1991). The convening authority, in his action, again rejected the request.

In 1969, Article 57(d), UCMJ, 10 USC § 857(d), was added to provide:

> On application by an accused who is under sentence to confinement that has not been ordered executed, the convening authority ... may in his sole discretion defer service of the sentence to confinement....

Pub.L. No. 90–632, § 2(24), 82 Stat. 1341 (1968).

This Court has held that the convening authority's discretion was reviewable. *United States v. Brownd,* 6 MJ 338, 339 (CMA 1979); *see United States v. Sloan,* 35 MJ 4, 6 (CMA 1992), 12 (Cox, J., concurring with reservations). We have also made clear that Article 57(d) imposes a burden on the convening authority to articulate "reasons ... sufficient as a matter of law to demonstrate that he did not abuse his discretion in denying petitioner's deferment request[.]" *Trotman v. Haebel,* 12 MJ 27, 28 (CMA 1981).

Appellant denounces the convening authority's explanation here as "entirely conclusory, ... [that] in important respects do[es] not withstand scrutiny." Final Brief at 43. In view of the instant circumstances, it is unnecessary for us to reconsider the accuracy of our prior holdings. We are satisfied that, conclusory though they may be, on this record the convening authority's explanation was sufficient.

A convening authority's decision on deferment of confinement is not separable from its context. The context includes the subject matter of the request: the court-martial that has just occurred. When a convening authority cites the seriousness of the offense and its impact on the community, it is thus appropriate to take into consideration the evidence marshaled at trial.

We note the brutality of the murder attempt of which appellant stands convicted. We also note evidence of appellant's lack of personal integrity, including his mendacity

and extravagance in connection with his trysts with his paramour, his manipulation and deceit in duping the victim out of her interest in the marital real estate; his purchase of a substantial term-insurance policy on the victim's life shortly before he attempted to dispatch her; and his efforts to make the murder attempt look like an accident. These and other matters of record amply justified the convening authority's misgivings about the likelihood of appellant's remaining available for confinement at the conclusion of the appellate process.

Appellant has not met his burden of persuading us that the convening authority abused his discretion in denying the deferment request. *See United States v. Brownd, supra;* RCM 1101(c)(3). The issue is without merit.

## F

■ We finally consider appellant's contention that the decision of the Court of Military Review affirming his conviction is invalid because he was denied a "right to a public hearing" before that court. Final Brief at 44. This issue relates to the conduct of the oral-argument hearing before the Court of Military Review. Our information about what occurred is derived from various affidavits filed in this Court. In broad terms, there is general agreement about what transpired.

A few days before oral argument in the Court of Military Review was scheduled, the Chief of the Army's Defense Appellate Division, Colonel Robert Kirby, approached the U.S. Army Legal Services Agency (USALSA) Executive, Colonel Joseph Neurauter, and his assistant, Major Paul Snyders. Colonel Kirby advised these officers that an unusually large number of spectators was anticipated at appellant's hearing and that there could be press interest. The next day, the Senior Judge of the panel assigned to hear appellant's case, Colonel Anthony De Giulio, also approached the USALSA Executive with concerns about crowd management for the hearing.

Colonel Neurauter and Major Snyders decided to provide as many chairs as practicable in the courtroom. The trade-off was that no one would be allowed to enter or exit once the arguments began because the additional chairs would so restrict movement in the small courtroom that spectators arriving or leaving would disrupt the arguments. In addition, the officers decided to ask Senior Judge De Giulio to commence the hearing about 5 minutes late to allow late-comers to be seated. Finally, military spectators would be asked to yield their seats to civilian spectators to permit the maximum number of civilians to attend. Both Senior Judge De Giulio and Colonel Kirby were briefed about the proposed procedures; Colonel Kirby, however, has no recollection of being notified about the courtroom-closure aspect.

On the day of the oral argument, appellant's family and a number of family friends were seated in the courtroom. Major Snyders positioned himself at the courtroom door. As the arguments commenced, Snyders noticed that approximately twenty people were seated in the courtroom, occupying approximately three-fourths of the available seating. At that point, Snyders realized that the precautions that had been taken were unnecessary. However, because the proceedings were already underway, with Senior Judge De Giulio in control of the courtroom, Major Snyders felt that he had no authority unilaterally to modify the plan. Therefore, he adhered to the predetermined policy and instructed the guard to deny further access to the courtroom. Some of appellant's family friends and some military lawyers not assigned to the case, approximately ten in all, arrived after the hearings had commenced and were denied access.

An irreconcilable dispute exists as to the precise time the hearings actually commenced. Major Snyders insists that, in accordance with the plan, the hearings commenced approximately 5 minutes after the officially appointed time. Furthermore he asserts in his affidavit that he remained at the door for 5 minutes thereafter and that no additional spectators had arrived as of

the time of his departure. Numerous parties affiliated with the Schneider family, however, and several counsel assigned to the Defense Appellate Division, insist that the hearings actually commenced before the officially appointed time. Several would-be spectators, moreover, allege that they were present at the courtroom door prior to the scheduled starting time, but were denied access because the hearings were already in session.

Article 66(a) of the Code requires the respective Judge Advocates General to "establish a Court of Military Review." However, nothing in Article 66 or elsewhere mandates that the Courts of Military Review conduct oral arguments in each of the cases reviewed. *United States v. Stinson,* 34 MJ 303, 306 (CMA 1992); *United States v. August,* 21 MJ 363, 364 (CMA 1986); *United States v. Rodriguez–Amy,* 19 MJ 177 (CMA 1985); *see* Rule 16, Rules of Practice and Procedure, United States Courts of Military Review, 22 MJ CXXXIII (1985); *cf. United States v. Lonetree,* 35 MJ 396, 411 (CMA 1992) (hearing closed to all without proper security clearances in case involving classified matters), *cert. denied,* —— U.S. ——, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993). Indeed, it appears that in a significant percentage of cases the Court of Military Review renders its decision without benefit of oral argument.

There being no requirement for oral argument at all, the decision of the Court of Military Review in appellant's case can hardly be fatally flawed by the fact that some potential spectators were denied access because a well-intentioned plan did not work out as projected.[7]

In retrospect, numerous steps might have been, but were not, taken to avoid the problem that occurred. The fact remains that a hearing was conducted that was attended by appellant's family and some members of the public, but that, notwithstanding the best of intentions, some people were excluded. These circumstances, in our opinion, do not constitute a denial of a public hearing, even if one was required. No error occurred to the material prejudice of a substantial right of appellant. Art. 59(a). This issue is without merit.

### III

The decision of the United States Army Court of Military Review is affirmed.

Judges COX, CRAWFORD, MAYER[8], and SPORKIN[9] concur.

Chief Judge SULLIVAN and Judges GIERKE and WISS did not participate.

---

**7.** While acknowledging that an appellant ordinarily had no enforceable right to appellate oral arguments, appellant contends that a different rule should apply to an appeal before a Court of Military Review because of the unique factfinding powers of those courts. Art. 66(c), UCMJ, 10 USC § 866(c). Thus, appellant argues that a Court of Military Review is more analogous to a trial court than an appellate court, and therefore the public-trial guarantees of the Sixth Amendment should apply. *Cf. Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). We reject this contention. Even though Courts of Military Review have factfinding power, they do not conduct evidentiary hearings. *Cf. United States v. Cole,* 31 MJ 270 (CMA 1990). Their determinations of fact are conducted *in camera,* and like any other appellate court, their review of the evidence is confined to the record of trial. *United States v. Spurlin,* 33 MJ 443, 444–45 (CMA 1991). Review by a Court of Military Review is not a trial within the meaning of the Sixth Amendment.

**8.** Judge H. Robert Mayer of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to Article 142(f), UCMJ, 10 USC § 942(f).

**9.** Judge Stanley Sporkin of the United States District Court for the District of Columbia, sitting by designation pursuant to Article 142(f), UCMJ, 10 USC § 942(f).