# UNITED STATES

v.

## David C. PESZYNSKI, 575–04–8247 Aviation Electronics Technician Second Class (E–5), U.S. Navy.

### NMCM 92 02202.

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 8 July 1992.

Decided 30 Aug. 1994.

---

LT David P. Sheldon, JAGC, USNR, Appellate Defense Counsel.

Maj Laura L. Scudder, USMC, Appellate Government Counsel.

Before LARSON, C.J., WELCH, Senior Judge, and McLAUGHLIN, J.

LARSON, Chief Judge:

Contrary to his pleas, the appellant was convicted by a special court-martial with officer members of one specification of communicating a threat and three specifications alleging behavior known generally, and referred to by the parties, as sexual harassment, all in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934. He was sentenced to a bad-conduct discharge. The question on appeal is whether the appellant's behavior as alleged in the

sexual harassment specifications and as defined for the members by the military judge, i.e., *repeated, unwelcome* and *sexually suggestive* comments, gestures and physical contact, violates Article 134, UCMJ. We hold that, under the circumstances of this case, it does not.

## I.

The appellant was assigned to an aviation squadron at Naval Air Station, Barber's Point, Hawaii. To supplement his income, he worked part-time as a shift manager at the Pizza Hut, a concession restaurant aboard the air station. Record at 206. Between November 1991 and March 1992, the three female victims of the charged offenses also worked at the Pizza Hut in positions subordinate to the appellant's. One was a third class petty officer (E–4) on active duty and assigned to another unit at Barber's Point. The other two were wives of active duty service members. Record at 163, 184, 205. All three were in frequent contact with the appellant at the Pizza Hut.

From nearly the first day on the job, each of the women became the object of a nearly constant stream of sexually suggestive comments and other forms of sexually suggestive behavior from the appellant. He would make frequent reference to their breasts and buttocks, ask them out socially (although the appellant and two of the victims were married), stare leeringly and obviously at their bodies, make up passages of a sexual nature from novels one victim was reading, and touch or stroke them in a manner reasonably perceived by them to be sexually suggestive. Record at 166–76. Each victim made it clear to the appellant that she wanted him to stop. Yet, he persisted.

In a letter written to his military superiors when the matter came to their attention, the appellant described his behavior as innocent and done in a joking manner and with the intent to create a friendly, relaxed atmosphere on the job. He stated that he told the women to tell him if they were offended and that he would then stop kidding them but that none lodged an objection. Prosecution Ex. 4. When one of the women finally did make it clear to a superior manager at the Pizza Hut that she was offended, the appellant was fired from his job. Record at 215–16.

The foregoing behavior led to Specifications 4, 5, and 6 of Charge III. Specification 4, in particular, alleged that the appellant:

[D]id engage in a course of conduct towards [the victim] which course of conduct involved repeated and unwelcome comments and gestures toward the said [victim] and repeated and unwelcome physical contact of the said [victim] that, under the circumstances, was to the prejudice of good order and discipline in the armed forces and was of a nature to bring discredit upon the armed forces.

The other two specifications were similar in nature, except that they did not allege "gestures" and Specification 6 did not allege any physical contact. The physical contact alleged by Specifications 4 and 5 also formed the basis for several specifications of simple assault and battery under Article 128, UCMJ, 10 U.S.C. § 928 (Charge II).

## II.

In an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, the appellant brought a motion to compel the Government to produce a bill of particulars. Rule for Courts–Martial (R.C.M.) 906. Record at 13. The defense position was that the specifications alleging sexual harassment were too vague and did not adequately put the defense on notice as to what to defend against. Appellate Ex. II. In response, the Government produced a bill of particulars, Appellate Exs. III and IV, which set forth the comments, gestures, and physical contact alleged in the specifications in the following detail:

The acts involving [the victim] occurred at Pizza Hut, Naval Air Station, Barbers Point, Hawaii from November 1991 to March 1992. They included the accused physically touching her face, chest, butt, back, shoulders, arms, and hands. The touching was frequent and unwelcome. The unwelcome and offensive comments and gestures of a sexual nature included but were not limited to stating how "fine" she was, how she had a "hot ass," would stare her up and down, and would read sex

scenes to her out of a book, and make comments about her body and her sex life. The comments and gestures were frequent and unwelcome.

Appellate Exs. III and IV.

The trial defense counsel asked the military judge to require even more specificity from the prosecution as to the precise comments and gestures upon which the Government would rely as the *actus reus* of the sexual harassment offenses. Record at 41–43. After repeated exchanges, the military judge was satisfied that the trial counsel had complied and denied the defense demand for more specificity. In response, the trial defense counsel declined to enter pleas to those offenses, stating that he could not do so because he was still not aware of which of the many acts set forth in the bill of particulars would actually constitute the offense under the Government's theory of the case. The military judge entered pleas of not guilty to those offenses. Record at 63; R.C.M. 910(b). The trial defense counsel then announced his intention not to contest these particular offenses for the same reason, i.e., the lack of clarity as to what acts constitute the offense. True to his word, he did not address them in his argument to the members. Record at 323.

In his instructions to the members, the military judge described these particular offenses under the title, "sexual harassment." He listed the elements for Specification 4 as follows:

That [at the place and on the dates alleged] the accused engaged in a course of conduct toward [the victim] which course of conduct involved repeated and unwelcome comments and gestures of a sexual nature and repeated and unwelcome physical contact with [the victim]; and

That, under the circumstances, the conduct of the accused was to the prejudice of good order and conduct in the armed forces or was of a nature to bring discredit upon the armed forces.

Record at 329–30. The elements for Specifications 5 and 6 were similar. He also defined the term sexual harassment as including "repeated or deliberate offensive comments or gestures of a sexual nature." After deliberating for nearly an hour, the members sought clarification concerning the nature of the offenses under Charge III. In response, the military judge repeated the elements and definition and told the members that while the first two specifications under Charge III alleged the offense of communicating a threat, the last three specifications alleged the offense of sexual harassment. Record at 342. In an Article 39(a), UCMJ, session, the trial defense counsel objected to the instructions regarding sexual harassment and stated his belief that the members' query demonstrated their confusion as to precisely what conduct by the accused actually constituted the alleged sexual harassment. Record at 343. He maintained that this confusion proved the defense point at the outset that the Government had failed to identify just what offending behavior established the offense. The military judge noted the objection and retired the members again. They returned with findings of guilty to the three sexual harassment specifications under Charge III but found the appellant not guilty of the assaults under Charge II.

In the appeal of his conviction for these sexual harassment offenses, the appellant has asserted as error, *inter alia,* that the military judge did not correctly define the offense of sexual harassment for the members and that neither terminal element of Article 134, i.e., prejudice to good order and discipline or discredit to the service, was proved.[1] While

---

1. I. THE MILITARY JUDGE'S FAILURE TO GIVE A PROPER INSTRUCTION DEFINING "SEXUAL HARASSMENT" CAUSED PLAIN ERROR.

II. MAKING INAPPROPRIATE SEXUAL COMMENTS TO JUNIOR EMPLOYEES AT A ON–BASE CIVILIAN ESTABLISHMENT WHILE EMPLOYED AS A SHIFT MANAGER FAILS TO ESTABLISH A LEGAL OR *PRIMA FACIE* ARTICLE 134 VIOLATION BECAUSE

SUCH CONDUCT IS NEITHER CONDUCT PREJUDICIAL TO GOOD ORDER AND DISCIPLINE NOR SERVICE DISCREDITING. (FOOTNOTE OMITTED.)

III. THE MILITARY JUDGE ERRED IN FAILING TO APPLY THE "LIBERAL GRANT MANDATE" ESPOUSED BY THE COURT OF MILITARY APPEALS WHEN THE JUDGE DENIED DEFENSE COUNSEL'S CHALLENGE FOR CAUSE AGAINST A MEMBER WHO STAT-

both assigned errors touch upon the central issue in this case, neither captures it precisely or completely. Therefore, we specified what we believe to be the central issue as well as an ancillary issue which had not been briefed. These specified issues are set out as follows:

I. WHETHER A COURSE OF CONDUCT DEFINED AS: REPEATED AND UNWELCOME COMMENTS AND GESTURES OF A SEXUAL NATURE AND REPEATED AND UNWELCOME PHYSICAL CONTACT TO THE PREJUDICE OF GOOD ORDER AND DISCIPLINE IN THE ARMED FORCES AND OF A NATURE TO BRING DISCREDIT UPON THE ARMED FORCES CONSTITUTES AN OFFENSE UNDER ARTICLE 134, UCMJ? (CITATIONS OMITTED.)

II. WHETHER THE PREEMPTION DOCTRINE PRECLUDES PROSECUTION OF THE "REPEATED AND UNWELCOME PHYSICAL CONTACT" ALLEGED IN SPECIFICATIONS 4, 5, AND 6 OF CHARGE III UNDER ARTICLE 134, UCMJ? (CITATIONS OMITTED.)

We received supplemental briefs from both parties addressing the specified issues and heard oral argument.[2]

### III.

■ A fundamental feature of due process of law is that one's guilt or innocence of a criminal accusation be determined by objective, clearly understood standards of criminality. *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). This feature is bound closely to another central theme of due process—that criminal statutes and implementing regulations provide fair notice to the public that certain proscribed behavior is subject to criminal sanction. *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). To comply with these constitutional requirements, criminal statutes must define (and based on that definition, judges must accurately instruct the triers-of-fact) precisely what constitutes criminal behavior and set forth an adequate yardstick by which to distinguish it from non-criminal behavior. *Smith*, 415 U.S. at 574, 94 S.Ct. at 1248. The Due Process Clause of the Fifth Amendment to the United States Constitution applies to service members. *United States v. Graf*, 35 M.J. 450 (C.M.A.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994); *Cooke v. Orser*, 12 M.J. 335 (C.M.A.1982). Accordingly, the principles set forth above are applicable to an accused facing trial by court-martial. *United States v. Ettleson*, 13 M.J. 348, 368 (C.M.A. 1982).

The first and second clauses of Article 134, UCMJ, simply proscribe acts which are prejudicial to good order and discipline and are of a nature to bring discredit upon the armed forces, respectively. Manual for Courts-Martial, United States, 1984 (MCM), Part IV, ¶ 60c(2), (3). Facially, this very general and vague language would not seem to pass the due process tests set forth above. How-

ED THAT DESPITE THE PRESUMPTION OF INNOCENCE, SHE WOULD STILL FIND THE ACCUSED GUILTY EVEN IF THE GOVERNMENT FAILED TO PROVE ITS CASE.

IV. APPELLANT'S COURT–MARTIAL VIOLATED HIS FIFTH AMENDMENT DUE PROCESS RIGHT BECAUSE ARTICLE 52(a)(2), U.C.M.J., ALLOWED A THREE MEMBER SPECIAL COURT–MARTIAL PANEL TO CONVICT APPELLANT WITH THE POSSIBLE CONCURRENCE OF TWO OF THE VOTING MEMBERS.

V. THE COURT–MARTIAL DID NOT HAVE JURISDICTION BECAUSE THE MILITARY JUDGE WAS NOT APPOINTED TO A FIXED TERM OF OFFICE. (CITATION OMITTED.)

VI. THIS COURT HAS NO JURISDICTION BECAUSE THIS COURT'S JUDGES WERE NOT APPOINTED TO A FIXED TERM OF OFFICE. (CITATION OMITTED.)

VII. APPELLANT'S COURT–MARTIAL LACKED JURISDICTION BECAUSE THE MILITARY JUDGE WAS DESIGNATED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION. (CITATION OMITTED.)

VIII. BECAUSE THIS COURT'S JUDGES WERE APPOINTED IN VIOLATION OF THE APPOINTMENTS CLAUSE, THIS COURT HAS NO POWER TO REVIEW APPELLANT'S CASE. (CITATION OMITTED.)

2. Oral argument was heard on 15 July 1994 at the Naval Legal Service Office, Norfolk, Virginia, as part of this Court's outreach program, which is designed to expose the appellate process to court-martial practitioners and other interested members of the Naval Service.

ever, its application to service members has been upheld as constitutional by the United States Supreme Court. *Parker.* At the heart of the Court's reasoning in *Parker* is its observation that, although the statutory language itself is broad and vague, application of Article 134 has been limited by the President through the Manual for Courts–Martial, by the military appellate courts through case law, and by long established military custom and tradition to behavior that is easily recognized by service members as subject to punitive sanction. *Id.* at 752–54, 94 S.Ct. at 2560–61. Indeed, the specific behavior alleged as a violation of Article 134 in Captain Levy's case—uttering statements disloyal to the United States—was, and still is, listed as one of the examples of an Article 134 violation in the MCM. MCM, Part IV, ¶ 72.

To keep faith with the limitations impliedly set down by the Court in *Parker,* specifications drawn under Article 134 must allege conduct clearly defined and easily recognizable in the military context as criminal. *United States v. Choate,* 32 M.J. 423 (C.M.A. 1991); *United States v. Woods,* 28 M.J. 318 (C.M.A.1989); *United States v. Davis,* 26 M.J. 445 (C.M.A.1988); *United States v. Sadinsky,* 14 C.M.A. 563, 34 C.M.R. 343 (1964); *United States v. Henderson,* 32 M.J. 941 (N.M.C.M.R.1991), *aff'd,* 34 M.J. 174 (C.M.A. 1992); *United States v. Williams,* 26 M.J. 606 (A.C.M.R.1988). By contrast, convictions based upon statutory language that does not adequately draw a line between criminal and non-criminal behavior have been found to be unconstitutional as violative of due process of law. *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Smith; United States v. Johanns,* 20 M.J. 155 (C.M.A.), *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985). For example, and with particular relevance to this case, a sexual harassment statute in Oregon that prohibited conduct that "alarmed or seriously annoyed" the victim was held unconstitution-

al. *State v. Sanderson,* 33 Or.App. 173, 575 P.2d 1025 (1978).

## IV.

The principle that specifications alleging violations of Article 134 must be clear in meaning and scope applies with even greater force to constitutionally protected activity, such as verbal expression.[3] *United States v. Priest,* 21 C.M.A. 564, 45 C.M.R. 338 (1972). In fact, each of the recognized forms of speech specifically proscribed by the UCMJ and the MCM is described by a particular label that sets forth a clear and objective standard by which to identify it as criminal and thereby distinguish it from non-criminal expression. In each, the label is an element of the offense which, as a legal term of art, is usually defined for the triers-of-fact. For example, indecent language, *United States v. French,* 31 M.J. 57 (C.M.A.1990), disrespectful language, *United States v. Wasson,* 26 M.J. 894 (A.F.C.M.R.1988), and language that communicates a threat, *United States v. Johnson,* 21 C.M.A. 279, 45 C.M.R. 53 (1972), or promotes disloyalty to the United States, *United States v. Harvey,* 19 C.M.A. 539, 42 C.M.R. 141 (1970), all describe forms of expression that are clearly recognized as punishable in nature. Likewise, provoking words, under Article 117, UCMJ, 10 U.S.C. § 917, a false official statement under Article 107, UCMJ, 10 U.S.C. § 907, and perjury under Article 131, UCMJ, 10 U.S.C. § 931, are all forms of expression whose criminal nature is easily determined.

By contrast, the verbal and non-verbal expression alleged in Specifications 4, 5, and 6 of Charge III in this case carries no such label or criminal description. Comments and gestures described only as "repeated," "unwelcome," and "of a sexual nature" simply do not, by themselves, provide a definitive standard of behavior subject to punitive sanction. These descriptive terms are not inherently criminal or even necessarily pejorative in nature; they are basically neutral.[4] As such,

---

3. A substantial portion of the appellant's behavior was verbal and even non-verbal expression (gestures).

4. "Unwelcome" comes the closest to being a criminal "label." Yet, it, too, is insufficient be-

cause it would permit conviction on the sole basis that the behavior was not wanted by the intended recipient. *See United States v. Asfeld,* 30 M.J. 917, 923 (A.C.M.R.1990). One accused of crime is entitled, as a matter of due process, to have his conduct judged according to some rec-

they do not serve as an adequate standard by which to determine criminal behavior.[5]

In addition, we note that the offense alleged in these specifications is not listed in the MCM and a review of the case law reveals no comparable offense.[6] Finally, we are unaware of any regulation or well-established custom of the service that proscribes behavior that is characterized *only* as repeated and unwelcome comments and gestures of a sexual nature. If there is any such regulation or custom, no evidence of its existence was introduced at trial. In other words, *none of the limiting factors that were persuasive in Parker v. Levy is present in this case.*

## V.

The specifications in question purport to allege an offense of sexual harassment. That is the title the military judge attached to the specifications and defined for the members. Record at 330.[7] Sexual harassment is a form of maltreatment of a subordinate, in violation of Article 93, UCMJ, 10 U.S.C. 893. MCM, Part IV, ¶ 17c.(2). *United States v. Kroop,* 38 M.J. 470, 472 n. 1 (C.M.A.1993). It is also the subject of a Department of the Navy policy directive, Secretary of the Navy Instruction (SECNAVINST) 5300.26A of 2 Aug 89 (in effect at the time of trial).[8] Pertinent provisions of that directive are set forth as follows:

Sexual harassment is defined as a form of sex discrimination that involves unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

. . . . .

c. such conduct interferes with an individual's performance or creates an intimidating, hostile, or offensive environment.

Any military member or civilian employee in a supervisory or command position who uses or condones implicit or explicit sexual

---

ognized, *objective* standard of criminality and not to rest solely upon the particular sensitivities of those who witness the conduct. *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

5. Arguably, when faced with the allegations in Specifications 4, 5 and 6 of Charge III, an accused could also claim that he was denied due process because he was not *on notice* that the conduct of which he was accused was subject to punitive sanction. *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *United States v. Van Steenwyk,* 21 M.J. 795 (N.M.C.M.R. 1985). We need not explore that question in this case because this appellant did not make that claim at trial and has not done so on appeal. In any event, it would have been difficult to make in his case. In particular, there is evidence in the record (Prosecution Ex. 7) that the appellant was on notice that his behavior was offensive. Furthermore, as appellate Government counsel notes in her brief, no one in the "post-Tailhook" Naval Service can reasonably claim that he or she was unaware that such conduct was improper.

6. In his dissent, Senior Judge Welch refers to the act of cross-dressing on a military installation that formed the basis for conviction in *United States v. Guerrero,* 33 M.J. 295 (C.M.A.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1173, 117 L.Ed.2d 418 (1992), as an example of comparable behavior. We distinguish that case for two reasons. First, the context in which Chief Petty Officer Guerrero's perverse behavior took place—as a direct affront to his military peers

and subordinates—brings it into the sphere of proscribed behavior that is easily recognized as such by the average man or woman in uniform. Second, the allegation against that accused contained the elemental term "wrongfully," which at least imparted some objective standard of criminality. *United States v. Guerrero,* 31 M.J. 692, 693 n. 1 (N.M.C.M.R.1990), *aff'd,* 33 M.J. 295 (C.M.A.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1173, 117 L.Ed.2d 418 (1992).

7. The appellant asserts that the definition of sexual harassment is inadequate even though, as the Government notes, it is an exact match of the version found in the MCM provision that addresses the offense of maltreatment of a subordinate under Article 93, UCMJ, 10 U.S.C. § 893. MCM, Part IV, ¶ 17c.(2). On the other hand, the definition does omit several key aspects found in the definition of sexual harassment in Navy policy directives in effect at the time (discussed below). In the end, the adequacy of the military judge's definition is not really the issue here. In fact, we find his act of defining that term to be a virtually meaningless exercise because he did not tell the members what to do with the definition. He did not relate it to the elements of the offense or, in any other manner, tell them how to apply it to the question of guilt or innocence.

8. That directive has been superseded by a second version, SECNAVINST 5300.26B of 6 Jan 93, which purports to make its requirements punitive in nature and therefore subject to prosecution under Article 92, UCMJ, 10 U.S.C. § 892.

behavior to control, influence, or affect the career, pay, or job of a military member or civilian employee is engaging in sexual harassment. Similarly, any military member or civilian employee who makes deliberate or repeated unwelcomed verbal comments, gestures, or physical contact of a sexual nature is also engaging in sexual harassment.

*See* enclosure (1) to SECNAVINST 5300.-26A.

Regulatory policy such as that contained above often reflects a long standing "custom" of the service, and as the Supreme Court made clear in *Parker v. Levy,* prosecution under Article 134 can be constitutionally based upon custom and usage. 417 U.S. at 754, 94 S.Ct. at 2561; *United States v. Johanns,* 20 M.J. 155 (C.M.A.), *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985); MCM, Part IV, ¶ 60c(2)(b). The difficulty in using this statement of policy as a basis to affirm this conviction on appeal is two-fold. First, the question of whether the appellant's conduct violated a custom of the Navy against sexual harassment was not litigated below. *See United States v. Wales,* 31 M.J. 301 (C.M.A.1990). Second, the definitional terms of sexual harassment quoted above highlight the shortcomings of the specifications in question even more. To constitute sexual harassment under Navy policy, the behavior must not only be of a certain nature, it must also *cause* a certain *result,* namely, interference with the victim's job performance or creation of a "hostile" working environment. Those key features of sexual harassment are at least standards that can be measured objectively. Furthermore, they appear to support the inference that the policy is limited to the military workplace, not off-duty civilian employment such as the case here.

Likewise, the definition in the U.S. Navy Regulations provision that prohibits sexual harassment contains limitations not·found in this case. That provision describes the prohibited behavior as "offensive" comments and gestures, an arguably objective (if not entirely clear) standard. It also appears to limit the scope of the provision to the military work environment. U.S. Navy Regulations § 1166 (1990). Even the relevant portion of the definition of sexual harassment taken from the MCM provision describing Article 93, UCMJ, and provided by the military judge, uses the term "offensive" to describe comments and gestures that constitute sexual harassment. Furthermore, to violate Article 93, sexual harassment must amount to cruelty, oppression, or maltreatment, elements that are explicitly measured by objective standards. MCM, Part IV, ¶ 17c.(2). This requirement assures that innocent behavior will not be trapped within the scope of the offense.

The elements of the offenses in this case, as set forth by the military judge, include none of these terms. We need not decide today if the inclusion of the terms discussed above would have been sufficient to describe an offense under Article 134.[9] It is clear that, without them, the charged behavior does not rise to the level of criminal conduct.

## VI.

The foregoing would seem to lead to a holding that the specifications in question fail to state an offense. The test for sufficiency of a specification is whether it states the elements of the offense; whether the defense is adequately apprised of what it must defend against; and whether the accused is protected against a subsequent prosecution. *United States v. Sell,* 3 C.M.A. 202, 11 C.M.R. 202 (1953). Despite his trial defense counsel's protestations to the contrary, the appellant was on notice as to the behavior that he was required to defend against through the bill of particulars and, for that reason as well, was protected against subsequent prosecution. Moreover, one can reasonably infer the listed

---

9. Our Army brethren found the Army's sexual harassment directive insufficient to establish conduct subject to prosecution under Article 92, UCMJ, in *United States v. Asfeld,* 30 M.J. 917 (A.C.M.R.1990). Part of the reason was the absence of an objective standard to measure the criminality of the accused's behavior. 30 M.J. at 923. *See also* LCDR J. Richard Chema, JAGC, USN, *Arresting "Tailhook": The Prosecution of Sexual Harassment in the Military,* 140 Mil. L.Rev. 1 (Spring 1993). The Chema article provides an insightful analysis of the difficulties of prosecuting military members under the Navy's sexual harassment directive.

elements from the actual wording in the specification. *United States v. French,* 31 M.J. 57, 60 (C.M.A.1990). The issue here is more fundamental than simply whether these specifications capture the elements sufficiently to withstand an attack of legal insufficiency. It is whether the elements themselves—as listed by the military judge for the members—even describe a violation of Article 134 at all.

It is in the instructions to the members that the fatal limitations of the charged offenses are most clearly exposed. Instructions provide the court-martial the legal framework within which it determines the accused's guilt or innocence. *United States v. O'Hara,* 14 C.M.A. 167, 33 C.M.R. 379 (1963). The standard for instructional adequacy is whether the instructions as a whole provide meaningful legal principles for the court-martial's consideration. *United States v. Truman,* 19 C.M.A. 504, 42 C.M.R. 106 (1970). Based on the instructions provided by the military judge in this case, the members were permitted to find the appellant guilty of a violation of Article 134 based on evidence of comments and gestures that were: 1) made more than once; 2) undesired by the intended recipients; and 3) pertained to sexual matters.[10] They were not required to determine whether these comments and gestures violated any standards of decency, standards of departmental policy, or custom of the service; whether they were offensive in nature or in violation of any other traditional norm commonly recognized as criminal; whether they were made with specific intent to harass or any other impure motive or state of mind; or whether they interfered

with the victim's employment or, for that matter, had any deleterious effect. In other words, *no standard was imparted by which to distinguish non-criminal from criminal behavior.* Accordingly, we find that the military judge provided an inadequate legal framework within which to determine whether the appellant's behavior violated Article 134, UCMJ, and, therefore, his conviction of these specifications cannot stand.[11] *Screws v. United States,* 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945); *United States v. Groce,* 3 M.J. 369 (C.M.A.1977); *United States v. Asfeld,* 30 M.J. 917 (A.C.M.R.1990).[12]

## VII.

Regarding the appellant's third assigned error, we find that the military judge did not abuse his discretion when he denied the challenge for cause against LCDR Huddleston. *United States v. White,* 36 M.J. 284 (C.M.A. 1993), *cert. denied,* — U.S. ——, 114 S.Ct. 918, 127 L.Ed.2d 212 (1994). We are confident that this member was able and inclined to follow the military judge's instructions regarding reasonable doubt and did so, notwithstanding her answers to the trial defense counsel's confusing questions. The remaining assignments of error have been previously decided adversely to the appellant's positions and are, therefore, devoid of merit. *Weiss v. United States,* — U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994); *United States v. Corl,* 6 M.J. 914 (N.C.M.R.), *petition denied,* 8 M.J. 41 (C.M.A.1979).

Accordingly, the findings of guilty to Specifications 4, 5, and 6 of Charge III and the

---

10. We recognize, of course, that, in addition to the above, the members had to be satisfied that the appellant's verbal and non-verbal behavior was either prejudicial to good order and discipline or was of a nature to bring discredit upon the armed forces. Even if we were to agree that one of these terminal elements was proved beyond a reasonable doubt, that element alone would not transform behavior that is merely offensive in a moral or social sense or that is not otherwise prohibited into criminal conduct. *United States v. Davis,* 26 M.J. 445 (C.M.A.1988); *Johanns; Henderson,* 32 M.J. at 944.

11. It is important to emphasize that our holding is not intended to suggest that the appellant's

patently obnoxious behavior could never be the basis of a properly alleged violation of Article 134, UCMJ, accompanied by proper instructions to the trier-of-fact. Whether it could be is a question we must leave for another day. Certainly, his conduct appears to be the type proscribed by Navy policy discussed above. However, as noted above, that policy appears to be directed toward such behavior within the military working environment, not the off-duty employment situation in this case.

12. Our resolution of the first specified issue renders the second specified issue moot, such that an answer to it would be no more than *obiter dictum.*

sentence are set aside. Specifications 4, 5, and 6 of Charge III are dismissed. The findings of guilty to Specification 3 under Charge III and to Charge III are affirmed. The case is returned to the Judge Advocate General who may return it to the same or a different convening authority who may order a rehearing on the sentence. If he finds a rehearing to be impractical, he may approve no punishment.

## McLAUGHLIN, Judge (concurring):

### PHYSICAL CONTACT

I find that the touchings described in Specifications 4 and 5 are preempted by Congress and the President under Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928, and those paragraphs of the Manual for Courts–Martial, United States, 1984, delineating other assaultive behaviors which contain aggravating factors increasing the maximum permissible punishment. In the MCM, the President expressly "prohibits application of Article 134 to conduct covered by [UCMJ] Articles 80 through 132."; MCM, 1984, Part IV ¶ 60c(5)(a); *see also United States v. McGuinness*, 35 M.J. 149 (C.M.A. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1364, 122 L.Ed.2d 743 (1993); *United States v. Curry*, 35 M.J. 359 (C.M.A.1992); *United States v. Asfeld*, 30 M.J. 917, 923 (A.C.M.R. 1990). By this "preemption," I mean that a new illegal touching, with fewer elements than the current assaultive touching would require to be proven and instructed upon, cannot be created through imaginative pleading under Article 134, UCMJ.

In each of those "other" assault offenses in the MCM, some even drawn under Article 134, UCMJ, the basic assault elements of Article 128, UCMJ, are still necessary elements, the members are to be instructed on them, and no fact-finder can convict unless they are convinced beyond a reasonable doubt of their existence, along with the other elements. Here, the military judge failed to instruct the members on the elements of assault that would make the "repeated and unwelcome physical contact of [victims]" a criminal offense, and perhaps shoehorn it into Article 134 (for whatever reason).

### COMMENTS AND GESTURES

In addressing the remaining portions of the three specifications, I note that in the MCM, 1969 (Rev.) there was a form for a specification under Article 134, UCMJ, labelled: "Indecent, insulting, or obscene language communicated to a female or a child under the age of 16 years." *Id.*, App. A6–23, ¶ 158. The language of that sample specification is not repeated in the 1984 Manual for Courts–Martial and, as indicated in the *Analysis*, the use of the terms "insulting" and "to a female" have been deliberately removed. Part IV, ¶ 89, MCM, United States, 1984, App. 21, A21–102. "[E]xcept for cases involving an affront to military authority ... insulting language between soldiers is not a violation of Article 134 unless the language conveys a libidinous message." *Id.* (citing *United States v. Linyear*, 3 M.J. 1027 (N.M.C.M.R.1977), *petition denied*, 5 M.J. 269 (C.M.A.1978)); *see also United States v. Choleva*, 33 C.M.R. 599 (N.B.R.1962). In the appellant's case, the instructions to the members allowed an open-ended offense of "repeated and unwelcome comments of a sexual nature toward [victim]" so long as a fact-finder would agree that the conduct was prejudicial to good order and discipline in the armed forces or of such a nature as to bring discredit to the armed forces, whether or not it was mean-spirited teasing, actual torment, or a libidinous message was intended to be conveyed. In *United States v. Henderson*, 32 M.J. 941 (N.M.C.M.R.1991), *aff'd*, 34 M.J. 174 (C.M.A.1992), this Court stated that not all disreputable and service discrediting conduct violates the general article.

> [A]lthough the government demonstrated that the appellant's conduct was morally reprehensible and was discrediting to the Marine Corps as testified to by several witnesses at trial, it failed to establish that appellant's conduct ... was prohibited by law, regulation or directive, or that appellant was fairly put on notice that his actions were discouraged as not being conduct becoming a recruiter, or that he abused his position.

32 M.J. at 945.

This case is the evil to be avoided that Judge Lawrence warned of in his concurring opinion in *Henderson*, where he stated:

The Government should be cautious in using Article 134 to create new offenses. *See United States v. Stocken*, 17 M.J. 826, 830 (A.C.M.R.1984). Clause 1 of Article 134 involves "disorders and neglects to the prejudice of good order and discipline in the armed forces." Clause 2 involves "conduct of a nature to bring discredit upon the armed forces." ... While the elements suggest that Article 134 is a license to create punishable offenses, in fact the creation of novel offenses under clauses 1 and 2 requires careful drafting of the specification to make clear what facts must be proved to warrant conviction. The military judge must then analyze the specification and evidence and draft clear instructions that inform the members what they must be convinced of beyond a reasonable doubt in order to vote for conviction.

*Id.* at 947 (footnote omitted). In this case I believe the specifications were deficient and this led to the military judge inadequately instructing the members. The offense stated in these three specifications, and the instructions given by the military judge, have resulted in the conviction of the offense of "engag[ing] in a course of conduct toward [the victims] which ... involved repeated and unwelcome comments of a sexual nature" and was prejudicial to good order and discipline or was service discrediting at a civilian-run pizza parlor on board the naval air station. Is that a crime? The appellant was NOT convicted of assault and he was NOT convicted of indecent language, although he was charged with both.

All parties to the case continually referred to "sexual harassment" as the gravamen of these three offenses. But, if this is a case of sexual harassment, then I would look to the federal law and military policy for *some* guidance as to what are the boundaries of that offense and what would be required as pleadings, proof, and instructions to members. I believe that it must start with an element of "work place" or "work-related," just as the current "sexual harassment" aspect of maltreatment of a subordinate under Article 93, (UCMJ) 10 U.S.C. § 893, requires that the victim be "subject to the orders" of the tormentor. *Id.* The latest policy contained on page 3 of SECNAVINST 5300.26B of 6 Jan 93 applies to "all conduct which occurs in or impacts a DOD working environment as defined in enclosure (2)." Enclosure (2) defines work environment as:

The workplace or any other place that is work-connected, as well as the conditions or atmosphere under which people are required to work. Example of work environment include, but are not limited to, an office, an entire office building, a DOD base or installation, DOD ships, aircraft or vehicles, anywhere when engaged in official DON business, as well as command-sponsored social, recreational and sporting events, regardless of location.

Because of the specification and instructional deficiencies in this record, I do not need to determine whether a civilian-run pizza parlor on board a military installation, at which military personnel and their spouses or children might work, is *that* kind of work place, or whether Article 93, UCMJ, reaches this non-Department of the Navy, non-Department of Defense superior/subordinate relationship.

Assuming that this is *that* kind of workplace, another element, as recognized by the Chief Judge in his opinion, would be that the unwelcome sexual behavior in the workplace *interferes* with another person's work performance or creates a "hostile environment." The potential also exists that the conduct creating the hostile environment must be "severe or pervasive." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). If, then, the conduct described was prejudicial to good order and discipline or service discrediting *and* the members were correctly instructed on these elements, a valid military crime might be established and properly charged as a form of disorderly conduct.

I also join in the Chief Judge's opinion in footnote 9 recognizing the insightfulness of Lieutenant Commander Chema's analysis.

WELCH, Senior Judge (dissenting):

I respectfully disagree with the majority's decision to dismiss the "sexual harassment" specifications (Specifications 4, 5, and 6 of Charge III). I concur with their disposition

of other issues raised by the appellant. My reasoning is summarized below.

## I. The Evidence Proved Sexual Harassment

Factually, this case is easy. The record clearly demonstrates that the appellant sexually harassed women on board Naval Air Station Barbers Point, Hawaii. Over an extended period of time, three women were the targets of his coarse remarks and gestures of a sexual nature. Two of the women were also frequently touched by the appellant in indecent ways described in the record. When the remarks and touching occurred, the appellant was a petty officer moonlighting as a shift manager at the Pizza Hut where the women worked. Two of the women (Mrs. H and Mrs. T) were wives of sailors assigned to squadrons at the air station. One of the three (PO3 K) was a petty officer junior in grade to the appellant and not in his chain of command (i.e., she was a member of a squadron at the air station; he was assigned to the air station). The appellant's conduct was not subtle; it was egregious, and indubitably one of the main reasons the court-martial members adjudged a bad-conduct discharge despite his relatively good military record.

## II. Sexual Harassment Not Amounting to Maltreatment May Be Prosecuted Under the General Article

This case deals with novel specifications under Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934. Thus, an analysis of the case should consider principles of law stated in *United States v. Guerrero*, 33 M.J. 295 (C.M.A.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1173, 117 L.Ed.2d 418 (1992) (affirming a conviction of a petty officer based on "cross-dressing").

In *Guerrero*, Judge Cox (citing *United States v. Davis*, 26 M.J. 445 (C.M.A.1988)), stated that Article 134 has two categories of proscribed conduct:

1—that which is "illegal under the common law or" statutes; and

2—"that which—however eccentric or unusual" is not unlawful in a civilian community but becomes illegal "solely because, in *the military context, its effect* is to prejudice good order or to discredit the service."

*Id.* at 297 (emphasis in original).

Prior to evaluating the cross-dressing allegation, the Court paid deference to the requirements of due process by agreeing that Petty Officer Guerrero was on notice that conduct either prejudicial to good order and discipline or tending to be service discrediting was an offense under Article 134. The factors indicating he had such notice included his status as a petty officer, his years of service, and the requirements of Article 137, UCMJ, 10 U.S.C. § 937 (certain provisions of the UCMJ must be explained to service members at various stages in their careers).

Next, the Court concluded that cross-dressing *per se* was not an offense. Rather, to determine whether cross-dressing is an offense (i.e., either conduct prejudicial to good order and discipline or conduct tending to bring discredit upon the armed forces), four factors must be considered: (1) the time, (2) the place, (3) the circumstances, and (4) the purpose for the cross-dressing. Finally, the Court added one caveat:

Also, the factfinder must be certain that the prejudice or the discrediting nature of the conduct is legitimately focused toward good order and discipline or discrediting to the armed forces, and is not solely the result of the personal fears, phobias, biases, or prejudices of the witnesses.

*Id.* at 298.

Prior to *Guerrero*, this Court provided similar clarification concerning the reach of Article 134 in *United States v. Carter*, 23 M.J. 683 (N.M.C.M.R.1986), petition for review dismissed, 24 M.J. 229 (C.M.A.1987) (holding that enlisted fraternization under service-discrediting or discipline-prejudicing circumstances violates Article 134, assuming adequate due process notice).

In my opinion, *Guerrero* and *Carter* provide the Government a legitimate means for taking effective action to deter sexual harassment that is not a violation of Article 93, UCMJ, 10 U.S.C. § 893 (maltreatment of a subordinate). Thus, I conclude that sexual

harassment may be the basis for a prosecution under Article 134 when the harassing conduct is prejudicial to good order and discipline or has a tendency to discredit the armed forces.

### III. The Specifications Alleging Facts Constituting Sexual Harassment Stated an Offense

First, charging an offense as a course of conduct over an extended period of time is perfectly proper. More precisely, as this case illustrates, allegations involving numerous individual acts of sexual harassment are most appropriately charged in specifications alleging a proscribed course of conduct over an extended period of time, as opposed to dozens of specifications citing individual acts (e.g., one victim claimed that over a period of several months the appellant commented on the size of her "boobs" 10 to 15 times a day—which could have been the basis of 300 to 450 charges a month. Record at 166). *See United States v. Hanson*, 30 M.J. 1198, 1201 (A.F.C.M.R.1990), *aff'd*, 32 M.J. 309 (C.M.A.), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2054, 114 L.Ed.2d 460 (1991) (affirming conviction of an officer for maltreatment of a subordinate by engaging in a course of conduct involving inappropriate comments over a two and a half year period).

Second, in my opinion, the specifications in question meet the test for legal sufficiency. The test is not whether a specification could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, sufficiently apprises the accused of what he must be prepared to meet, and provides the accused with a record to prevent a second prosecution for the same offense. *United States v. Sell*, 3 C.M.A. 202, 206, 11 C.M.R. 202, 206 (1953). The specification may allege the elements either expressly or by implication. *United States v. French*, 31 M.J. 57, 59 (C.M.A.1990).

Because the majority concludes that the main reason for not affirming the sexual harassment convictions was instructional error by the military judge, I will not extend this discussion concerning the legal sufficiency of the specifications further, other than to note that some of my comments in Section V of this dissent concerning the instructions are equally applicable to the specifications (e.g., the insertion in the specifications of phrases lifted from Secretary of the Navy Instruction [SECNAVINST] 5300.26A of 2 August 1989 focused the members attention on pertinent wording in statements of departmental policy).

At the bottom line, the specifications, which alleged an offense denominated as sexual harassment by all lawyers at the appellant's trial, are classic examples of novel specifications properly drafted pursuant to principles of law stated in *Guerrero* and *Carter*.

### IV. The Appellant Had Adequate Notice of the Illegality of His Conduct

To determine whether the appellant had fair notice that his conduct violated Article 134 (i.e., whether he was afforded due process of law), the critical question is whether he

> could reasonably understand that his contemplated conduct might violate the statute. Notice can be gleaned, *inter alia*, from proof of custom, regulation or the degree to which the alleged misconduct patently violates the specified norms of the Article. The mere fact that there is some flexibility of meaning or some difficulty in determining whether marginal actions fall within the language of the statute is not determinative.

*Carter*, 23 M.J. at 685 (citing *United States v. Van Steenwyk*, 21 M.J. 795, 801 (N.M.C.M.R. 1985)).

"[R]esort to the surrounding circumstances is appropriate to determine the adequacy of notice." *Van Steenwyk*, 21 M.J. at 809.

Although footnote 5 of the lead opinion acknowledges that the appellant does not claim that he lacked notice that his conduct was illegal, I list the following information from the record to allay any concerns regarding due process considerations:

a. The appellant attended sexual harassment training on 29 April 1988. Prosecution Exhibit 7.

b. On 9 November 1990, the appellant was placed on report by a chief petty officer for sexual harassment of a female sailor, alleged violations of "Art. 134, Art. 117, Art. 89, Art. 91, Art. 92." This led to the appellant being counselled by a Navy lieutenant whose written summary of the counselling session is crystal clear: "KNOCK IT OFF!!! ANY FURTHER REPEAT OF THIS WITH AN [W] OR ANY ONE ELSE WILL RESULT IN *IMMEDIATE* PROCESSING OF THIS REPORT CHIT AS WELL AS ANY NEW CHARGES. THERE IS NO ROOM FOR BEHAVIOR OF THIS KIND AND IT WILL *NOT* BE TOLERATED." Prosecution 6 for Identification (not admitted in evidence). Record at 304–306.

c. At trial, the victims testified that they told the appellant to stop the offensive conduct directed toward them. Record at 166, 190, 194, 208, 212, and 213.

d. The appellant's civilian defense counsel conducted extensive voir dire of the court-martial members on 6 July 1992. His questions focused the members attention on "Tailhook," the "Tomcat Follies," newspaper articles and messages from senior officials concerning sexual harassment, and sexual harassment training of naval personnel. For example, the civilian defense counsel asked one court member to state the number of times he had taken sexual harassment training. The member replied, "[P]retty often. I'd say at least once a year ... since I've been in Hawaii, probably at least two or three times, minimum." Record at 110. Later, the civilian defense counsel asked another court member, "[Y]ou would agree, would you not, that people who engage in sexual harassment are engaging in career-endangering conduct?" "Absolutely," replied the member. Record at 112. Then he asked another member "Do you feel you know what sexual harassment is?" The member replied, "I feel I do, yes." Record at 126. The voir dire is significant because it demonstrates the efforts the Navy had taken prior to the date of the alleged offenses to put all hands—including the appellant—on notice that sexual harassment was improper conduct for naval personnel. It also indicates that the meaning of "sexual harassment" was common knowledge among the court-martial members, a factor to be considered when evaluating the effect of the military judge's instructions.

Based on this record, the appellant's status as a second class petty officer, and the requirements of Article 137, UCMJ, I am convinced that the appellant could—and did—understand that his offensive course of conduct might violate the UCMJ. Thus, in my opinion, he had the notice that satisfies the requirements of due process of law.

## V. The Instructions Were Adequate and Did Not Prejudice the Appellant

The heart of the lead opinion is the conclusion that the military judge erred by failing to provide adequate instructions concerning the alleged sexual harassment charges (i.e., "[N]o standard was imparted by which to distinguish non-criminal from criminal behavior."). Although the instructions could have been better, I conclude that they provided adequate guidance and, more importantly, that any instructional errors committed did not prejudice the appellant.

The instructions faulted by the majority concern elements of the offenses charged and certain definitions. These instructions may be summarized as follows:

a. Specifications 4, 5, and 6 of Charge III are similar specifications alleging sexual harassment in violation of Article 134, UCMJ. The elements are as follows:

(1) That at Naval Air Station, Barbers Point, Hawaii, from on or about ____ to ____, the accused engaged in a course of conduct toward ____, which course of conduct involved repeated and unwelcome comments and gestures of a sexual nature toward ____ and repeated and unwelcome physical contact of ____, and

(2) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

b. "Conduct prejudicial to good order and discipline" is conduct which causes a reasonably and obvious injury to good order and discipline. "Service discrediting conduct" is

conduct which tends to harm the reputation of the service or lower it in the public esteem.

c. "Sexual harassment" includes repeated or deliberate offensive comments or gestures of a sexual nature.

The words "repeated and unwelcome comments and gestures of a sexual nature" in the instructions and specifications were not invented by the military judge or trial counsel. They were lifted from the regulation that provided guidance throughout the Navy concerning sexual harassment (SECNAVINST 5300.26A of 2 August 1989). Additionally, the military judge's explanation of the meaning of "sexual harassment" was a direct quote from Manual for Courts–Martial, United States (MCM), 1984, Part IV, ¶ 17c(2).

In my opinion, it is significant that the phraseology used in the instructions and specifications emanated from regulations promulgated by the Secretary of the Navy and the President, in his capacity as Commander–in–Chief, because these officials can properly establish standards of conduct for naval personnel. When they establish such standards, it seems reasonable to include significant phraseology from the standards when drafting instructions and specifications describing alleged misconduct contrary to the standards, as was done in this case. Contrary to the conclusions stated in Section VI of the lead opinion, I find that the use of the phrases lifted from the Secretary of the Navy instruction and the MCM, coupled with the instructions concerning the terminal element of the Article 134 offenses, clearly indicate that the members were required to determine whether the appellant's comments and gestures violated standards of departmental policy.

In evaluating the instructions, we must follow the law stated in *United States v. Fox*, 34 M.J. 99 (C.M.A.1992) (quoting from *United States v. Mance*, 26 M.J. 244, 255–56 (C.M.A.), *cert. denied*, 488 U.S. 942, 109 S.Ct. 367, 102 L.Ed.2d 356 (1988)), a case of alleged fraternization between a male Air Force officer and an enlisted female member of the Air Force:

[W]hen a judge *omits entirely* any instruction on an element of the charged offense, this error may not be tested for harmlessness because, thereby, the court members are prevented from considering that element at all. In a real sense, the members in such an instance are directed to find that the evidence proves that element beyond a reasonable doubt. On the other hand, when a judge's instruction adequately identifies an element to be resolved by the members and adequately requires that the members find the necessary predicate facts beyond a reasonable doubt, then an *erroneous* instruction on that element may be tested for harmlessness.

*Fox* at 104. The Court in *Fox* then observed that the error committed by the trial judge did not fit neatly into either of the categories mentioned in *Mance* because, even though the "custom" element of fraternization was given by the judge, he did not instruct the members as to the custom in the Air Force. Thus, the Court would not test the error for prejudice because, with regard to the "custom" element, the judge offered the members "no definition, no guidance, no focus on what is, in the Air Force, a critical requirement concerning the relationship." *Fox* at 104.

In my opinion, the instructions in this case fall in the second category identified in *Mance* and *Fox*. They adequately identified the elements of the offenses and adequately required the members to find the necessary predicate facts beyond a reasonable doubt. Thus, if we find instructional errors, we must determine whether the errors are harmless.

Turning to the lead opinion in this case, I find that it places too much weight on the fact that neither Specifications 4, 5, and 6 of Charge III nor the military judge's instructions concerning the elements of these alleged offenses contain the word "offensive." Although inclusion of the word "offensive" in the specifications and the listing of the elements might have been wise, I do not find that the failure to include that word in either the specifications or the elements constituted error. To the contrary, I believe the instructions provided an adequate standard to distinguish innocent behavior from criminal behavior, and that the standards were properly

based on guidance from the Secretary of the Navy and the MCM. More importantly, if the instructions fell short of some legal lodestar, the errors committed were not prejudicial to the appellant. Many reasons lead me to this juncture.

First, the instructions concerning the first element of the offenses conveyed the message that the members could only convict the appellant if they found beyond a reasonable doubt that (1) the appellant had engaged in a certain course of conduct over an extended period of time on board a naval installation, and (2) the course of conduct involved behavior prohibited by the Navy regulation concerning sexual harassment (i.e., repeated and unwelcome comments and gestures of a sexual nature and unwelcome physical contact). The instructions concerning the second element conveyed the message that a mere finding that the appellant had engaged in a certain course of conduct was inadequate to support a conviction, and that a conviction could only result from the members finding beyond a reasonable doubt that the course of conduct, under all the circumstances, was either prejudicial to good order and discipline in the armed forces or had a tendency to be service discrediting. The instructions concerning the second element adds the objectivity requirement that the lead opinion finds significantly lacking in the instructions. That is to say, the members could not convict the appellant merely because they found that he had engaged in the course of conduct stated in the explanation of the first element of the Article 134 offenses. Rather, the members were required to step back and evaluate all the circumstances of the factual situation presented and to objectively determine, based on their years of training and experience, whether the appellant's course of conduct had either a tendency to be service discrediting or was prejudicial to good order and discipline in the armed forces. In performing that function, they were doing what courts-martial members traditionally do when considering charges alleging violations of two clauses of Article 134. More significantly, that second step in the deliberative process assured that the appellant would not be convicted solely because his conduct was below subjective standards imposed by his victims. In my opinion, the second step counters comments in the lead opinion concerning the lack of a requirement of objectivity, and provides assurances that the instructions comported with the law stated in *Guerrero* and *Carter*.

Second, although the term "offensive" was not in the elements—and not in the specifications—it was in the judge's explanation of the meaning of sexual harassment ("Sexual harassment includes repeated or deliberate offensive comments or gestures of a sexual nature." Record at 330.). This explanation surely put the members on notice that they could not convict the appellant of "sexual harassment" if an objective observer would conclude that the appellant's words and actions were not offensive. More importantly, the record discloses conduct by the appellant so coarse that no reasonable person could find it to be less than offensive. Indeed, just as Justice Stewart knew obscenity when he saw it,[1] the members no doubt knew from the totality of the evidence before them that the appellant's course of conduct was so abusive and unwarranted that it mandated his conviction. *Hanson*, 30 M.J. at 1201. Thus, in my opinion, the failure to include "offensive" in the description of the elements of the offenses was a fact of little significance (i.e., not prejudicial error).

Third, the term "sexual harassment" was used constantly by all the parties to the trial. The explanation given concerning the meaning of "sexual harassment," was taken from MCM, Part VI, ¶ 17. The explanation was not a definition of the term; it was merely an illustrative listing of activities that constitute sexual harassment. It did, however, assure that the members were not left in a quandary concerning the meaning of the term and the issues before them. Additionally, it is not critical that every term in an instruction be given a legal definition. Even the Court of Military Appeals occasionally finds dictionary definitions worthy of quotation (*see Guerrero* at 298 n. 2). Stated otherwise, I am confident that the experienced, educated, and intelligent officers on the appellant's

---

1. *Jacobellis v. Ohio*, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

court-martial—who had themselves received training concerning sexual harassment—understood the basic meaning of sexual harassment and the standards that guided their deliberations.

Fourth, during argument on findings, the civilian defense counsel focused his attention on the assault charges and virtually conceded that the appellant's actions were properly characterized as sexual harassment (albeit, he did not concede that Article 134 had been violated):

> As I told you in the beginning, I don't intend to discuss the last three specifications. That matter is left to you. But I ask you to look at this case for what it is: A sexual harassment case and nothing more than a sexual harassment case.

Record at 323.[2] No doubt, these comments, coupled with the lack of any credible evidence indicating that the appellant's conduct was not sexual harassment and the overwhelming evidence of sexual harassment, made the members' decision regarding the sexual harassment offenses a relatively easy venture. In all probability, the challenging issue debated during deliberations was whether the terminal element of an Article 134 offense was proved. The comments also lessened the chances that the members were either confused or misled by the military judge's instructions (i.e., lessened the chances of the instructions infecting the trial with prejudicial error).

Fifth, *State v. Sanderson*, 33 Or.App. 173, 575 P.2d 1025 (1978), quoted in the lead opinion (holding unconstitutional a sexual harassment statute prohibiting conduct that "alarmed or seriously annoyed" the victim) is inapposite. That decision involved a civilian community and had nothing to do with either a military installation or the concerns that led Congress to write Article 134. Although I have not read the Oregon statute cited in the case, I trust that it contained nothing resembling the terminal element of an offense under Article 134. The terminal element of the an offense in violation of one of

the first two clauses in Article 134 adds a requirement of objectivity that was simply not present in this Oregon case.

Sixth, when second guessing the members' decision in this case and evaluating the effect of any instructional error on their judgement, we should be mindful of a comment from the Supreme Court:

> Of questions not depending upon the construction of statutes, but upon the unwritten military law or usage, within the jurisdiction of courts-martial, military or naval officers, from their training and experience, are more competent judges than the courts of common law.

*Parker v. Levy*, 417 U.S. 733, 749, 94 S.Ct. 2547, 2558, 41 L.Ed.2d 439 (1974) (quoting *Swaim v. United States*, 165 U.S. 553, 562, 17 S.Ct. 448, 451, 41 L.Ed. 823 (1897)). *See also Van Steenwyk*, at 808 n. 10.

## VI. The Appellant's Conduct Was Service Discrediting and Prejudicial to Good Order and Discipline in the Armed Forces

The record contains convincing proof that the appellant's sexual harassment was clearly service discrediting and prejudicial to good order and discipline in the armed forces. Reference to a few illustrative bits of evidence should prove this point. Petty Officer K was belittled, angered, and humiliated by the appellant's conduct. Record at 166. Comments to her were made in the presence of other service members. Record at 243. No doubt, she lost respect for him, a factor that affects good order and discipline in the armed forces. Mrs. H testified that the appellant told her that her husband, a sailor, was not a real man like he was, that her husband would not do anything if he learned of the appellant's comments because he was not good enough for her, and that Mrs. H should live with the appellant. Mrs. H felt so bad at one time that she was going to quit working. Mrs. H told her husband about the appellant's comments and her husband called

---

**2.** The civilian defense counsel told the military judge at arraignment, that he would make such a concession based on directions from the appellant and their trial strategy. They intended to rely on favorable appellate action. His statement to the military judge was made after he declined to enter pleas to Specifications 4, 5, and 6 of Charge III because he did not know "what constitutes the *actus reas* of the offense." Record at 65–66.

the appellant about them. Record at 212 and 215. Mrs. T testified that the appellant would invite her out and say her husband, a sailor, would never know. Mrs. T witnessed sexually harassing conduct by the appellant directed toward the other two woman. Mrs. T told her husband about the appellant's comments. Record at 187, 193, and 349. Comments directed toward Petty Officer K and Mrs. T were heard by a 17–year–old civilian cook. Record at 267.

Fortunately, in this case, the aggrieved parties used peaceful means to cause the appellant to stop his abusive conduct. However, experience tells us that the appellant's actions could have easily led to physical confrontations. It takes little imagination to envision (a) a disgruntled sailor planting his fist on the appellant's nose after learning of the appellant's comments to his wife, conduct obviously contrary to good order and discipline, and (b) every one in Pizza Hut who observed appellant's conduct concluding that the appellant is a walking, breathing discredit to the U.S. Navy.

At the bottom line, the court-martial members heard the evidence and determined that the Government proved the existence of the terminal element of the Article 134 offenses beyond a reasonable doubt. I find nothing in this record causing me to doubt the wisdom of their judgment.

### VII. Unique Situation: One Victim a Military Subordinate on a Naval Installation

One of the three victims in this case was a petty officer subordinate in grade to the appellant. Thus, she would be required to obey the appellant's orders—even at the Pizza Hut—if faced with a situation which clearly imposed a duty on her to obey his orders (e.g., he orders her to stop participating in a fight with another sailor). Thus, arguably, sexual harassment of Petty Officer K might rise to an offense under Article 93, UCMJ (maltreatment of a subordinate). I use the term "arguably" because dicta in *United States v. Curry*, 28 M.J. 419, 424 (C.M.A. 1989) (petty officer convicted of maltreatment by attempting to obtain a body massage from a junior female sailor not in his

chain of command) indicates that the Court of Military Appeals might conclude that Petty Officer K had no duty to obey the appellant's orders at the Pizza Hut when he was sexually harassing her and, thus, that she could not be the victim of maltreatment in violation of Article 93.

In all probability, the Government did not charge the appellant with a violation of Article 93 because of then Chief Judge Everett's comments in *Curry* indicating the futility of such action: "As we understand the evidence, [the woman the appellant asked to give him a massage] had no duty which required her to obey any orders of appellant." 28 M.J. at 424. I invite attention to these facts because they help one appreciate the problems confronting the Government when charges were drafted and the reasonableness of the course of action taken (i.e., prosecution under Article 134 on specifications alleging a course of conduct in words lifted from the existing directive on sexual harassment, rather under Article 93).

### VIII. The Doctrine of Preemption is Inapplicable

Contrary to the author of the concurring opinion, I conclude that the inclusion of the alleged touching described in Specifications 4 and 5 of Charge III was not preempted by Congress or the President. The doctrine of preemption applies only if two questions are answered in the affirmative:

The primary question is whether Congress intended to limit prosecution for wrongful conduct within a particular area or field to offenses defined in specific articles of the Code; the secondary question is whether the offense charge is composed of a residuum of elements of a specific offense and asserted to be a violation of either Articles 133 or 134, which, because of their sweep, are commonly described as the general articles.

*United States v. McGuinness*, 35 M.J. 149, 151–152 (C.M.A.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1364, 122 L.Ed.2d 743 (1993) (quoting *United States v. Wright*, 5 M.J. 106, 110–111 (C.M.A.1978)).

892

The concurring opinion appears to proclaim that allegations of physical contact cannot be included in specifications alleging sexual harassment and that any allegations of illegal physical contact must be prosecuted under some other article (e.g., Article 128). If true, such a position can unduly complicate prosecution of valid sexual harassment cases.

As indicated in this case, sexual harassment frequently involves both offensive physical contact and offensive verbal comments. True, some sexually harassing physical contact might be easily isolated, regarded as a battery, and appropriately punished under Article 128. Other sexually harassing physical contact, standing alone, might be regarded as a *de minimis* battery unworthy of prosecution. However, in many cases, charging separate acts of battery and verbal sexual harassment becomes unwieldy and counter-productive. As a practical matter, many cases of sexual harassment are most honestly and convincingly stated when the specifications contain allegations of both physical contact and offensive comments, as opposed to separate specifications attempting to focus attention on isolated physical and verbal conduct. Indeed, the combination of physical contact and offensive remarks in one specification charging sexual harassment can normally be expected to have a synergistic effect that conveys a most precise and accurate description of the alleged illegal conduct. Thus, absent compelling authority to the contrary, I see no good reason for us to demand that the Government slice in two those allegations of continuous misconduct involving both physical and verbal sexual harassment (i.e., that we require prosecution under two different articles of the UCMJ). To the contrary, the simple and direct way to prosecute sexual harassment is to permit allegations of both physical contact and offensive comments to be included in one specification. I find no expression of intent by either Congress or the President that mandates bifurcated charges when sexual harassment involves both physical contact and verbal comments. Thus, I conclude that the preemption doctrine is not applicable to this case.

### IX. The Effect of the Lead Opinion

I fear the majority's opinion places too many strictures on prosecution of service members who engage in sexual harassment that is not clearly a violation of Article 93. In particular, the opinion makes it difficult to prosecute a service member for sexually harassing a military dependent on board a military installation. In my opinion, Article 134, *Guerrero*, and *Carter* provide an appropriate vehicle for properly balancing the need for good order and discipline against the desire to impose only reasonable restraints on First Amendment freedoms on board our military installations.

In summary, the matters discussed above lead me to conclude that the novel sexual harassment specifications were properly drafted, that the military judge provided adequate instructions to guide the members in their deliberations, that instructional errors, if any, were not prejudicial, and that the evidence proved the offenses alleged beyond reasonable doubt. I would affirm the conviction relating to the sexual harassment charges.